Lois FROLOVA, Plaintiff-Appellant,

v.

UNION OF SOVIET SOCIALIST RE-
PUBLICS, Defendant-Appellee.

No. 83–1451.

United States Court of Appeals,
Seventh Circuit.

Submitted April 10, 1985.*

Decided May 1, 1985.

* This appeal has been submitted to the court on plaintiff-appellant's brief and the record, for decision without oral argument, because defendant-appellee has never appeared in this action and has not filed an appellate brief. *See* Circuit Rule 8(c).

Anthony D'Amato, Northwestern Law School, Chicago, Ill., for plaintiff-appellant.

Before BAUER, WOOD and COFFEY, Circuit Judges.

PER CURIAM.

Lois Becker, an American citizen and a graduate student at Stanford University, traveled to the Soviet Union in 1981 to do research for her dissertation on nineteenth century Russian political literature. While there, she met and fell in love with Andrei Frolov, a Soviet citizen, and the two of them were married in Moscow on May 19, 1981. The plaintiff, now as Lois Frolova, returned to the United States when her visa expired in June 1981. Her husband was forced to stay behind because he did not yet have the documentation or official permission needed to leave the Soviet Union. In September 1981 Mr. Frolov's request to leave the U.S.S.R. was denied because of "bad relations with the United States."

Mr. Frolov renewed his request in March 1982 (apparently there is a six-month waiting period before a person can reapply for permission to leave the U.S.S.R.), shortly after his wife arrived in Moscow on a twenty-day tourist visa. This request was turned down in April 1982; the reason given this time was that Frolov's departure was "not in the interest of the Soviet State." The next month Mr. Frolov began a hunger strike, along with six other Muscovites who also had spouses living abroad.

On May 20, 1982, Lois Frolova filed the instant action, seeking an injunction and damages against the Soviet Union. She alleged that, as a result of the U.S.S.R.'s refusal to permit her husband to emigrate, she had suffered mental anguish, physical distress and loss of her rights of consortium. Ten days later, Mr. Frolov was informed by the Soviet secret police, the KGB, that he should apply for an exit visa. He did so and left the Soviet Union on June 20, 1982.

After her husband arrived in the United States, plaintiff abandoned her request for injunctive relief but not her claim for damages. The district court, acting *sua sponte*,[1] dismissed the action. *Frolova v.*

1. The Soviet Union has never appeared in this action. It was served with a copy of the complaint by certified mail delivered to the Soviet embassy in Washington, D.C. The Foreign Sovereign Immunities Act contains provisions for service of process in all actions involving a foreign state, 28 U.S.C. § 1608, and in *Alberti v. Empresa Nicaraguense de la Carne,* 705 F.2d 250, 253 (7th Cir.1983), this court ruled that service by mail on the Nicaraguan ambassador in Washington was insufficient under § 1608(a)(3). Plaintiff has not briefed the ques-

*Union of Soviet Socialist Republics,* 558 F.Supp. 358 (N.D.Ill.1983). The court discussed, but did not decide, whether the Soviet Union was immune from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), Pub.L. No. 94–583, 90 Stat. 2891. 558 F.Supp. at 361–63. Instead, the court ruled that dismissal was required by the act of state doctrine [2] because the denial of Mr. Frolov's emigration request was an act of state that was not the proper subject of litigation in American courts. *Id.* at 363–64.

We need not discuss the applicability of the act of state doctrine because we conclude that under the FSIA the Soviet Union was entitled to sovereign immunity and that the district court, as a result, lacked jurisdiction. Accordingly, we affirm the district court's dismissal of this action.

## I.

For most of this nation's history foreign countries have traditionally been granted complete immunity from suit in American courts. *See The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). In 1952 the State Department adopted the "restrictive" theory of foreign sovereign immunity in the so-called Tate Letter, 26 Dept. of State Bull. 984 (1952),[3] by which the United States would recognize another sovereign's immunity with regard to sovereign or public acts, but not for private acts. The application of the new doctrine was left principally to the discretion of the State Department until Congress passed the FSIA in 1976. *See generally Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486–89, 103 S.Ct. 1962, 1967–69, 76 L.Ed.2d 81 (1983).

The FSIA—which, in general, codifies the restrictive theory of sovereign immunity, *id.* at 488, 103 S.Ct. at 1968—was designed to move resolution of foreign sovereign immunity issues from the Executive Branch to the judiciary. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6606; S.Rep. No. 1310, 94th Cong., 2d Sess. 9. In addition, Congress intended the provisions of the FSIA to be the "sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States." H.R.Rep. No. 1487 at 12, 1976 U.S.Code Cong. & Ad. News at 6610. Accordingly, the comprehensive scheme established by the FSIA is the exclusive means by which foreign countries may be sued in American courts. *Id.; Verlinden,* 461 U.S. at 493, 103 S.Ct. at 1971.

The FSIA begins with the presumption that foreign states are immune from suit, subject to specified exceptions. Section 1604 of Title 28 of the U.S.Code provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

Furthermore, a district court lacks jurisdiction of a suit against a foreign country until it is determined that the defendant does not have immunity.

> The district court shall have original jurisdiction without regard to amount in controversy of any nonjury civil action

---

tion whether service in the instant case satisfied one of the other methods provided by § 1608(a), but even if service was insufficient we will not dismiss the case on that basis and give plaintiff another chance to properly serve the U.S.S.R. "It would be a waste of judicial resources to allow plaintiffs to go through the motions of service if the suit will be later dismissed on some other ground." *Alberti,* 705 F.2d at 253.

**2.** *See Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897).

**3.** The Tate Letter is quoted extensively in *Sugarman v. Aeromexico, Inc.,* 626 F.2d 270, 273–74 (3d Cir.1980).

against a foreign state ... as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a). Thus, the statement in the legislative history that sovereign immunity is an affirmative defense which must be pleaded and proven by the party asserting it, H.R.Rep. No. 1487 at 17, 1976 U.S.Code Cong. & Ad.News at 6616, is not entirely accurate. Because the absence of sovereign immunity is a prerequisite to subject matter jurisdiction, the question of immunity must be considered by a district court even though the foreign country whose immunity is at issue has not entered an appearance. *Verlinden*, 461 U.S. at 493 n. 20, 103 S.Ct. at 1971 n. 20.

Frolova asserts on appeal that the Soviet Union's immunity is waived by two international agreements and three statutory provisions. We shall consider each in turn.

## II.

Frolova's first argument is that the U.S.S.R. is not entitled to sovereign immunity because of the international agreement exception found in 28 U.S.C. § 1604 ("Subject to existing international agreements ..."). She contends that the provisions of the United Nations Charter, 59 Stat. 1033 (1945), and the Helsinki Accords (officially entitled Conference on Security and Cooperation in Europe: Final Act), 73 Dept. of State Bull. 323 (1975), may be enforced by private litigants.

■■■ Treaties made by the United States are the law of the land, U.S. Const. art. VI, but if not implemented by appropri-

ate legislation they do not provide the basis for a private lawsuit unless they are intended to be self-executing. *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 808 (D.C.Cir.1984) (Bork, J., concurring), *cert. denied*, — U.S. ——, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *Dreyfus v. Von Finck*, 534 F.2d 24, 30 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). Whether a treaty is self-executing is an issue for judicial interpretation, Restatement (Second) of Foreign Relations Law of the United States, § 154(1) (1965), and courts consider several factors in discerning the intent of the parties to the agreement: (1) the language and purposes of the agreement as a whole; (2) the circumstances surrounding its execution; (3) the nature of the obligations imposed by the agreement; (4) the availability and feasibility of alternative enforcement mechanisms; (5) the implications of permitting a private right of action; and (6) the capability of the judiciary to resolve the dispute. *Tel-Oren*, 726 F.2d at 808–10 (Bork, J., concurring); *United States v. Postal*, 589 F.2d 862, 876–77 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *People of Saipan v. United States Dept. of Interior*, 502 F.2d 90, 97 (9th Cir.1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); *Sei Fujii v. State*, 38 Cal.2d 718, 721–24, 242 P.2d 617, 620–22 (1952). Of course, if the parties' intent is clear from the treaty's language courts will not inquire into the remaining factors. *See, e.g., Cardenas v. Smith*, 733 F.2d 909, 918 (D.C.Cir.1984).

■■■ The provisions of the United Nations Charter on which plaintiff relies are Articles 55 and 56.[4] We have found no

**4.** Article 55 provides:

With a view to the creation of conditions of stability and well-being which are necessary for peaceful and friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples, the United Nations shall promote:

a. higher standards of living, full employment, and conditions of economic and social progress and development;

b. solutions of international economic, social, health, and related problems; and international cultural and educational cooperation; and

c. universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion.

Article 56 provides:

All Members pledge themselves to take joint and separate action in cooperation with the

case holding that the U.N. Charter is self-executing nor has plaintiff provided us with one. There are, however, quite a few decisions stating that the Charter is not self-executing.[5] Indeed, a significant number of decisions have rejected the precise argument made here with respect to Articles 55 and 56.[6] We agree with those rulings: Articles 55 and 56 do not create rights enforceable by private litigants in American courts.

To begin with, the articles are phrased in broad generalities, suggesting that they are declarations of principles, not a code of legal rights. *See Tel-Oren*, 726 F.2d at 809 (Bork, J., concurring). In Article 56, for example, the member nations pledge to assist in achieving the principles of Article 55. This is not the kind of promissory language that will create a judicially-enforceable right. *See In re Alien Children Education Litigation*, 501 F.Supp. 544, 590 (S.D.Tex.1980) (treaty agreement to ex-

ert greatest efforts to advance education does not imply promise to provide free public education), *aff'd sub nom. on other grounds, Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Sei Fujii*, 38 Cal.2d at 722–24, 242 P.2d at 621. Nothing in the wording of either article indicates an intent to prescribe "rules by which private rights may be determined," *Dreyfus v. Von Finck*, 534 F.2d at 30, or to provide a means by which citizens of the signatory nations could enforce the lofty, but too often unrealized, principles expressed in the Charter. Articles 55 and 56 create obligations on the member nations (and the United Nations itself); they do not confer rights on individual citizens. *See Tel-Oren*, 726 F.2d at 809 (Bork, J., concurring); *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C.Cir.1976); *People v. Saipan*, 502 F.2d at 101 (Trask, J., concurring); *Sei Fujii*, 38 Cal.2d at 722, 242 P.2d at 621.

Organization for the achievement of the purposes set forth in Article 55.
59 Stat. 1045–46.

**5.** *See Tel-Oren*, 726 F.2d at 809 (Bork, J., concurring); *People of Saipan*, 502 F.2d at 100–02 (Trask, J., concurring); *Puerto Rico v. Muskie*, 507 F.Supp. 1035, 1064 (D.P.R.1981), *vacated sub nom. on other grounds, Marquez-Colon v. Reagan*, 668 F.2d 611 (1st Cir.1981); *Lareau v. Manson*, 507 F.Supp. 1177, 1187 n. 9 (D.Conn. 1980), *aff'd and modified on other grounds*, 651 F.2d 96 (2d Cir.1981); *In re Alien Children Education Litigation*, 501 F.Supp. 544, 590 (S.D.Tex. 1980), *aff'd sub nom. on other grounds, Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Pauling v. McElroy*, 164 F.Supp. 390, 393 (D.D.C.1958), *aff'd*, 278 F.2d 252 (D.C.Cir.) (per curiam), *cert. denied*, 364 U.S. 835, 81 S.Ct. 1, 5 L.Ed.2d 60 (1960); *cf. Vlissidis v. Anadell*, 262 F.2d 398, 400 (7th Cir.1959) (U.N. Charter does not invalidate Immigration and Nationality Act of 1952). *But see United States v. Toscanino*, 500 F.2d 267, 277–79 (2d Cir.1974) (International law, including U.N. Charter, violated in bringing defendant within district court's jurisdiction when he was allegedly forcibly abducted and brutally tortured by American agents in Uruguay).

**6.** *See Spiess v. C. Itoh & Co. (America), Inc.*, 643 F.2d 353, 362–63 (5th Cir.1981) (Article 55), *vacated on other grounds*, 457 U.S. 1128, 102 S.Ct. 2951, 73 L.Ed.2d 1344 (1982); *Filartiga v. Pena-Irala*, 630 F.2d 876, 881 (2d Cir.1980) (Articles 55 and 56); *Hitai v. Immigration and Naturali-*

*zation Service*, 343 F.2d 466, 468 (2d Cir.1965) (Article 55); *Camacho v. Rogers*, 199 F.Supp. 155, 158 (S.D.N.Y.1961) (Articles 55 and 56); *Sei Fujii v. State*, 38 Cal.2d at 722–24, 242 P.2d at 621–22 (Articles 55 and 56).

In *Filartiga*, the Second Circuit treated provisions of the U.N. Charter as evidence of customary international law in connection with a jurisdictional argument—based on 28 U.S.C. § 1350 (establishing district court jurisdiction over cases involving torts committed in violation of the law of nations)—that Frolova does not advance here. 630 F.2d at 880–85. *See also Lareau v. Manson*, 507 F.Supp. 1177, 1187 n. 9 (D.Conn.1980) (Although not self-executing, U.N. Charter's human rights provisions, including Articles 55 and 56, are evidence of principles of customary international law; case involved challenge to prison conditions where state Corrections Department had adopted U.N. standards on treatment of prisoners), *aff'd and modified on other grounds*, 651 F.2d 96 (2d Cir. 1981). The only other opinions that are contrary to a blanket rejection of Articles 55 and 56 as sources of privately enforceable rights are inapposite, as they involved arguments that the U.N. Charter provided additional support for a ban on racial discrimination in connection with the sale or ownership of property in the United States. *See Oyama v. California*, 332 U.S. 633, 649–50, 68 S.Ct. 269, 277, 92 L.Ed. 249 (1948) (Black and Douglas, JJ., concurring); *id.* at 673, 68 S.Ct. at 288 (Murphy and Rutledge, JJ., concurring); *Hurd v. Hodges*, 162 F.2d 233, 245 (D.C.Cir.1947) (Edgerton, J., dissenting), *rev'd*, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948).

Moreover, judicial resolution of cases bearing significantly on sensitive foreign policy matters, like the case before us, might have serious foreign policy implications which courts are ill-equipped to anticipate or handle. *See Tel-Oren,* 726 F.2d at 810 (Bork, J., concurring); *Diggs v. Richardson,* 555 F.2d at 851; *see generally Flynn v. Shultz,* 748 F.2d 1186, 1189–93 (7th Cir.1984). Soviet emigration policies have been the subject of a long-running battle between American policymakers and the Kremlin, often generating conflict between the White House and Congress. Judicial intervention into such a delicate political issue would be ill-advised and could have unforeseen consequences for American-Soviet relations.

There is no basis for concluding that Articles 55 and 56 are privately enforceable. Unless the United Nations alters its fundamental nature and amends its Charter, individuals having grievances based on Articles 55 and 56 will have to be satisfied with diplomatic channels and the court of world opinion to resolve their disputes; they may not bring suit in American courts.

A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do and can give no redress.

*The Head Money Cases,* 112 U.S. 580, 598, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884).

■ Similarly, we hold that the Helsinki Accords are not self-executing. Frolova contends that certain sections of that agreement create judicially-enforceable rights, including provisions concerning (1) contacts and regular meetings on the basis of family ties; (2) reunification of families; and (3) marriage between citizens of different states. 73 Dept. of State Bull. at 339–40.

To begin with, the caution against judicial involvement in this nation's foreign relations is as applicable to the Helsinki agreement as it is to the U.N. Charter. In addition, the sections of the Helsinki Accords with which we are concerned are, like the U.N. Charter (although to a lesser degree), phrased in generalities, and there is no indication that the nations signing the agreement anticipated that it would be enforced by private litigants. Indeed, the Accords reaffirm respect for the sovereignty of its signers, *id.* at 324, and pledge noninterference in the internal affairs of those nations, *id.* at 325. Rather, the Accords create obligations on the signatory countries and establish goals which the nations will try to reach on their own.

In fact, the sections of the Accords most relevant to the case before us—concerning marriage between citizens of different states and family reunification [7]—vest the

---

7. The section on marriage between citizens of different states reads as follows:

The participating States will examine favourably and on the basis of humanitarian considerations requests for exit or entry permits from persons who have decided to marry a citizen from another participating State.

The processing and issuing of the documents required for the above purposes and for the marriage will be in accordance with the provisions accepted for family reunification.

In dealing with requests from couples from different participating States, once married, to enable them and the minor children of their marriage to transfer their permanent residence to a State in which either one is nor-

mally a resident, the participating States will also apply the provisions accepted for family reunification.

73 Dept. of State Bull. at 340.

The provisions on family reunification state in relevant part:

The participating States will deal in a positive and humanitarian spirit with the applications of persons who wish to be reunited with members of their family, with special attention being given to requests of an urgent character—such as requests submitted by persons who are ill or old.

They will deal with applications in this field as expeditiously as possible.

participating states with considerable discretion in deciding whether and when to allow reunification of spouses living in different countries. Moreover, introductory clauses directly preceding the provisions quoted in note 7 pronounce that the participating states "declare their readiness to these ends to take measures which they consider appropriate" and "express their intention now to proceed to the implementation of the following." 73 Dept. of State Bull. at 339–40. This language clearly leaves implementation of the provisions at issue here to the discretion of the nations concerned. Because these passages contemplate further action by the participating states to carry out the provisions that follow, it is obvious that the agreement is not self-executing. *United States v. Postal*, 589 F.2d at 876–77; *Sei Fujii*, 38 Cal.2d at 722, 242 P.2d at 621. "A treaty that provides that party states will take measures through their own laws to enforce its proscriptions evidences its intent not to be self-executing." *Tel-Oren*, 726 F.2d at 809 (Bork, J., concurring).

Finally, President Ford's statement before signing the agreement is forceful evidence that the parties did not intend the Accords to be self-executing:

> I would emphasize that the document I will sign is neither a treaty *nor is it legally binding on any particular state.* The Helsinki documents involve political and moral commitments aimed at lessening tension and opening further the lines of communication between the peoples of East and West.

73 Dept. of State Bull. 204, 205 (1975) (emphasis added).[8] Individuals aggrieved by the failure of nations to implement the Helsinki Accords will have to be content with the principle that violations of international agreements "are normally to be redressed outside the courtroom." *Canadian Transport Co. v. United States*, 663 F.2d 1081, 1092 (D.C.Cir.1980).

### III.

Plaintiff next raises an argument closely related to that discussed in Part II: the Soviet Union has waived its defense of sovereign immunity. The FSIA provides that foreign countries are not immune in cases "in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1). Frolova contends that the U.S.S.R. implicitly waived its sovereign immunity when it signed the United Nations Charter and the Helsinki Accords;[9] in ad-

---

> Applications for the purpose of family reunification which are not granted may be renewed at the appropriate level and will be reconsidered at reasonably short intervals by the authorities of the country of residence or destination, whichever is concerned; under such circumstances fees will be charged only when applications are granted.
>
> ⋅ ⋅ ⋅ ⋅ ⋅
>
> Until members of the same family are reunited meetings and contacts between them may take place in accordance with the modalities for contacts on the basis of family ties.

⋅ ⋅ ⋅ ⋅ ⋅

*Id.* We note that the Soviet Union apparently complied with the last provision quoted when it allowed Frolova to visit her husband in Moscow in March 1982.

**8.** As President Ford noted, the Helsinki Accords do not have treaty status. The agreement itself provides that it is "not eligible for registration under Article 102 of the Charter of the United Nations." 73 Dept. of State Bull. at 349. Article

102 of the Charter states that treaties come into force when registered with and published by the U.N. Secretariat; if not registered, agreements may not be invoked before any organ of the United Nations. 59 Stat. at 1052–53. In addition, the Helsinki agreement was never presented to the U.S. Senate for approval. *See* U.S. Const. art. II, § 2.

**9.** In Part II of this opinion, we discussed the international agreement exception found in 28 U.S.C. § 1604. In the context of waiver of immunity by treaty, sections 1605(a)(1) and 1604 obviously overlap to some extent. If an international agreement is self-executing and may therefore be the basis of an action under § 1604—that is, if it creates rights enforceable by private litigants—then, in addition, it almost certainly waives sovereign immunity under § 1605(a)(1), thus providing a dual basis for district court jurisdiction. For purposes of this opinion, however, we need not define the interrelationship between the two sections because it is clear that neither the United Nations

dition, she argues that waiver can be implied from the Soviet Union's failure to enter an appearance in this action.

The legislative history of the FSIA gives three examples of cases in which courts have found implied waivers: (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that a contract is governed by the law of a particular country; and (3) a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6617; S.Rep. No. 1310, 94th Cong., 2d Sess. 18. Since the FSIA became law, courts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity.

Cases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed. Courts have found an implicit waiver under § 1605(a)(1) in cases involving contracts in which a foreign state has agreed to arbitrate disputes without specifying jurisdiction in a particular country or forum, *see, e.g., Birch Shipping Corp. v. Embassy of United Republic of Tanzania,* 507 F.Supp. 311, 312 (D.D.C.1980); *Libyan American Oil Co. v. Socialist People's Libyan Arab Jamahirya,* 482 F.Supp. 1175, 1178 (D.D.C. 1980), or where another nation has stipulated that American law should govern any contractual disputes, *see Resource Dynam-*

*ics Int'l, Ltd. v. General People's Committee,* 593 F.Supp. 572, 575 (N.D.Ga.1984). But most courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States.[10]

Another indication that the implicit waiver clause of § 1605(a)(1) is narrowly construed is the line of cases holding that a contract's waiver of immunity does not apply to third parties not privy to the contract. *See Keller v. Transportes Aereos Militares Ecuadorianos,* 601 F.Supp. 787, 788–89 (D.D.C.1985); *Transamerican Steamship Corp. v. Somali Democratic Republic,* 590 F.Supp. 968, 974 (D.D.C. 1984); *Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1285 (E.D.Pa.1981). Thus, courts rarely find that a nation has waived its sovereign immunity, particularly with respect to suits brought by third parties, without strong evidence that this is what the foreign state intended. *See Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1100 n. 10 (D.C.Cir.1982) (Congress contemplated waivers of a much more specific and explicit nature than the one constructed by plaintiff), *cert. denied,* —— U.S. ——, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983); *Castro v. Saudi Arabia,* 510 F.Supp. 309, 312 (W.D.Tex. 1980) (there must be intentional and knowing relinquishment of sovereign immunity defense).

The discussions of § 1605(a)(1) in the committee reports refer to waiver by trea-

---

Charter nor the Helsinki Accords implicitly waives the Soviet Union's immunity from suit.

**10.** *See Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1284–85 (E.D.Pa.1981) (waiver of immunity as to one jurisdiction is not a waiver as to all jurisdictions); *Chicago Bridge & Iron Co. v. Islamic Republic of Iran,* 506 F.Supp. 981, 987–88 (N.D.Ill.1980) (same); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 500 F.Supp. 320, 323 n. 3 (S.D.N.Y.1980) (same), *rev'd on other grounds,* 647 F.2d 300 (2d Cir. 1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1300–02 (S.D. N.Y.1980) (same), *aff'd on other grounds,* 647 F.2d 320 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81

(1983). *See also Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1102–04 (D.C.Cir.1982) (immunity not waived where agreement did not contemplate role for American courts even though arbitration would probably take place in United States), *cert. denied,* —— U.S. ——, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983); *Transamerican Steamship Corp. v. Somali Democratic Republic,* 590 F.Supp. 968, 973–74 (D.D.C.1984) (participation in American foreign aid program is not implicit waiver of immunity). The only case to the contrary, *Ipitrade Int'l, S.A. v. Federal Republic of Nigeria,* 465 F.Supp. 824, 826 (D.D.C.1978) (contract's choice of Swiss law and European forum to resolve disputes waived immunity in American courts), has never been followed.

ty, but only in the context of *explicit* waivers of sovereign immunity;[11] waiver by treaty is not included in the list of examples of implicit waivers, *see supra* at 377. Courts have generally required convincing evidence that a treaty was intended to waive sovereign immunity before holding that a foreign state may be sued in this country. *See, e.g., Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329, 333 (9th Cir.) (treaty waiving immunity as to enterprises of Iran does not extend to Iran itself), *cert. denied,* — U.S. —, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984); *O'Connell Machinery Co. v. M.V. "Americana",* 734 F.2d 115, 117 (2d Cir.) (treaty waiving immunity for "any other liability" not broad enough to include prejudgment attachments under 28 U.S.C. § 1610(d)), *cert. denied,* — U.S. —, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984); *Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344, 1350 (11th Cir.1982) (explicit treaty clause waiving immunity); *Libra Bank Ltd. v. Banco Nacional de Costa Rica,* 676 F.2d 47, 49–50 (2d Cir.1982) (explicit waiver found under § 1610(d)); *Skeen v. Federative Republic of Brazil,* 566 F.Supp. 1414, 1419 (D.D.C.1983) (provision in Vienna Convention on Diplomatic Relations requiring diplomats to respect laws of receiving state does not create privately enforceable duty in case in which ambassador's grandson allegedly shot and assaulted plaintiff).

■ Here there is absolutely no evidence from the language, structure or history of the agreements at issue that implies a waiver of the U.S.S.R.'s sovereign immunity. There is no basis for finding a waiver from the vague, general language of the agreements nor is there any reason to conclude that the nations that are parties to these agreements anticipated when signing them that American courts would be the means by which the documents' provisions would be enforced. To the contrary, as our discussion in Part II indicated, the countries that agreed to the United Nations Charter and the Helsinki Accords retained considerable discretion in implementing the provisions on which Frolova's suit is based; indeed, President Ford's statement that the latter agreement is not legally binding is a convincing rebuttal to plaintiff's argument that private citizens may enforce the Accords. Neither document implicitly waives the Soviet Union's defense of sovereign immunity.

■ Frolova's argument that the Soviet Union implicitly waived its immunity by not defending this action is also without merit. As the Supreme Court indicated in *Verlinden,* even in cases in which the defendant has not entered an appearance the district court has an obligation to satisfy itself that the defense of sovereign immunity is not available before it has subject-matter jurisdiction. 461 U.S. at 493 n. 20, 103 S.Ct. at 1971 n. 20. Moreover, the example given in the legislative history—filing a responsive pleading without raising an immunity defense, *see supra* at 377—demonstrates that Congress anticipated, at a minimum, that waiver would not be found absent a conscious decision to take part in the litigation and a failure to raise sovereign immunity despite the opportunity to do so. The case law evidences a reticence to find a waiver from the nature of a foreign state's participation in litigation. For example, in *Castro v. Saudi Arabia,* 510 F.Supp. at 311–12, the court held that the defendant's failure to timely answer the complaint did not waive sovereign immunity. And in *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.,* 727 F.2d 274, 277–78 (2d Cir.1984), the court ruled that the district court did not err in finding that sovereign immunity was not waived, although the defendant never filed a responsive pleading but instead filed several motions which did not assert sovereign immunity, and a Rule 12(b)(1) motion to dismiss based on sovereign immunity was not filed until over two and one-half years after the complaint was filed.

---

11. "With respect to explicit waivers, a foreign state may renounce its immunity by treaty, as has been done by the United States with respect to commercial and other activities in a series of treaties of friendship, commerce, and navigation...." H.R.Rep. No. 1487 at 18, 1976 U.S. Code Cong. & Ad.News at 6617; S.Rep. No. 1310 at 17.

## IV.

The last statutory section on which plaintiff attempts to hang her jurisdictional hat is 28 U.S.C. § 1605(a)(5), which provides in pertinent part that immunity is waived in cases

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or ommission [sic] of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment....

At first blush, it appears that there is jurisdiction if the injury, as here, occurs in this country, regardless of whether the tortious act causing the injury occurred within this nation's borders. At least one district court has read § 1605(a)(5) this broadly, *see Letelier v. Republic of Chile,* 488 F.Supp. 665, 671–74 (D.D.C.1980),[12] but this interpretation has been rejected by the Court of Appeals for that circuit, *Persinger v. Islamic Republic of Iran,* 729 F.2d 835, 842–43 (D.C.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984); *Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517, 1524–25 (D.C. Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985), and by every other court that has considered the issue, *see Olsen v. Government of Mexico,* 729 F.2d 641, 645–46 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984);[13] *In re Sedco, Inc.,* 543 F.Supp. 561, 567 (S.D.Tex.1982). *See also Australian Government Aircraft Factories v. Lynne,* 743 F.2d 672, 674–75 (9th Cir.1984) (injuries to pilot's family in United States are indirect consequence of plane crash in Indonesia and insufficient to support jurisdiction under direct effect exception of § 1605(a)(2)), *cert. denied,* —— U.S. ——, 105 S.Ct. 1189, 84 L.Ed.2d 335 (1985); *see generally McKeel v. Islamic Republic of Iran,* 722 F.2d 582, 589 n. 10 (9th Cir.1983), *cert. denied,* —— U.S. —— 105 S.Ct. 243, 83 L.Ed.2d 182 (1984).

The reason that the decisions just cited reject the broad construction of § 1605(a)(5) posited by plaintiff, and the reason we join them today, is that there is explicit legislative history indicating that Congress intended that the tortious act or omission, as well as the injury, occur in the United States.

> Section 1605(a)(5) is directed primarily at the problem of traffic accidents but is cast in general terms as applying to all tort actions for money damages, not otherwise encompassed by section 1605(a)(2) relating to commercial activities. It denies immunity as to claims for personal injury or death, or for damage to or loss of property, caused by the tortious act or omission of a foreign state or its officials or employees, acting within the scope of their authority; *the tortious act or omission must occur within the jurisdiction of the United States....*

H.R.Rep. No. 1487 at 20–21, 1976 U.S.Code Cong. & Ad.News at 6619; S.Rep. No. 1310 at 20 (emphasis added). Although it is possible to construe the statute as *Frolova* does—to mean that the tortious act or omission can occur anywhere in the world so long as the injury occurs on American soil—we cannot do so in light of strikingly clear legislative history to the contrary. "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

Moreover, § 1605(a)(2) demonstrates that when Congress intended to provide jurisdiction for acts outside this country having an

---

**12.** *See also Persinger v. Islamic Republic of Iran,* 729 F.2d 835, 844 (D.C.Cir.) (Edwards, J., concurring and dissenting), *cert. denied,* —— U.S. ——, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984).

**13.** In *Olsen,* the Ninth Circuit ruled that as long as plaintiffs alleged that one tortious act occurred in the United States, the occurrence of other contemporaneous tortious acts or omissions outside of the United States did not deprive the district court of jurisdiction. The complaint here alleges that all of the defendant's tortious acts took place in the Soviet Union. Accordingly, we express no opinion on the holding in *Olsen.*

effect within our borders, it said so explicitly. That section provides that there is no immunity for a foreign state's commercial activities outside American territory that cause "a direct effect in the United States." The legislative history indicates that this provision was adopted in accordance with the principles found in Restatement (Second) of Foreign Relations Law of the United States, § 18 (1965). H.R.Rep. No. 1487 at 19, U.S.Code Cong. & Ad.News at 6618; S.Rep. No. 1310 at 19. Section 18 of the Restatement provides that, subject to certain restrictions, a nation has jurisdiction to attach legal consequences to conduct outside its territory that causes an effect within its territory. A reference to § 18 is conspicuously absent from the sections of the committee reports discussing § 1605(a)(5).[14]

The judgment of the district court is AFFIRMED.

---

**14.** In support of her interpretation of § 1605(a)(5), Frolova cites the Restatement (Revised) of Foreign Relations Law of the United States 191 (Tent. Draft No. 2 1981). This draft actually cuts against plaintiff's argument. True, it construes § 1605(a)(5) to grant jurisdiction if the tortious act or omission causing injury in the United States occurred elsewhere, an interpretation which, as we have seen, has been almost uniformly rejected by the courts. But the very next sentence addresses cases such as Frolova's: "Indirect effects in the United States, such as loss of consortium resulting from injury to a claimant's spouse by a foreign state outside the United States, are not within the jurisdiction of courts in the United States under this section." *Id.* at 191.