United States Court of Appeals,
Fifth Circuit.
No. 91–1325.

Romarico S. MORE, et al., Plaintiffs–Appellants,

v.

INTELCOM SUPPORT SERVICES, INC., Defendant–Appellee.

May 11, 1992.

Appeals from the United States District Court for the Northern District of Texas.

Before REYNALDO G. GARZA, GARWOOD and DUHÉ, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

PROCEDURAL HISTORY

Plaintiffs are 146 citizens of the Philippines who were employed by Intelcom Support Services, Inc. ("Intelcom") to work at the U.S. Air Force Base on Wake Island. At all relevant times a treaty was in effect; to wit:

> AGREEMENT BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE REPUBLIC OF THE PHILIPPINES RELATING TO THE RECRUITMENT AND EMPLOYMENT OF PHILIPPINE CITIZENS BY THE UNITED STATES MILITARY AND CIVILIAN AGENCIES OF THE UNITED STATES GOVERNMENT IN CERTAIN AREAS OF THE PACIFIC AND SOUTHEAST ASIA.

19 U.S.T. 7560, T.I.A.S. 6598 ("Treaty").

Plaintiffs filed suit on March 24, 1987, alleging wrongful discharge and breach of the Treaty, as well as breach of the covenant of good faith and fair dealing and deceptive trade practices.

Plaintiffs filed a Motion for Partial Summary Judgment requesting that the court rule that the Treaty "conferred rights upon Plaintiffs" and that "Christmas bonus equivalent ... is owing by the Defendant ..." The district court denied Plaintiffs' Motion and held that "the agreement between the government of the United States of America and the government of the Republic of the Philippines

does not give Plaintiffs a private right of action for Christmas bonuses, as the treaty is not self-executing." The district court held t hat therefore "Plaintiffs do not have standing to claim a violation of its terms."

Defendant thereafter filed a Motion to Dismiss stating that Plaintiffs' claims under the Texas Deceptive Trade Practices Act ("DTPA") and fo r breach of the covenant of good faith and fair dealing fail to state valid causes of action. The district court granted Intelcom's Motion and dismissed Plaintiffs' claims under the DTPA and the covenant of good faith and fair dealing.

Plaintiffs filed a Second Motion for Partial Summary Judgment requesting that the trial court reconsider its ruling on their first Motion for Summary Judgment. This Motion remained pending through a bench trial.

After the bench trial, the district court ruled in favor of Intelcom, finding that Defendant had not wrongfully discharged Plaintiffs, that the Treaty was not self-executing and that Plaintiffs were not covered by its terms.

FACTS

Plaintiffs were all recruited in the Philippines to work for a defense contractor at the U.S. Air Force Base on Wake Island. Most had worked for a succession of defense contractors, all using virtually the same written employment agreement.

The Philippine Government, pursuant to the dictates of the Treaty, approved both a recruitment agreement and a standard employment agreement for the employment of Filipino workers by Intelcom to fulfill an Air Force contract. Intelcom, which had succeeded to the Wake Island Air Force Base contract, employed Plaintiffs from approximately 1983–86. Plaintiffs signed employment agreements, each with identical language, which lasted for a period of one year. The commencing

and ending dates of the individual employment agreements with Plaintiffs varied, but all extended beyond September 30, 1986.

According to Section 6(a) of the written agreements:

> Severance Pay:  In the event that the Employer's contract with the United States Government for service on Wake Island is terminated or otherwise curtailed for any reason or, if a general reduction in the work force becomes necessary, the Employer may terminate his individual Employment Agreement with the Employee by giving the Employee written notice specifying the date on which the Employer will schedule return transportation for the Employee.  Such notice shall not be less than thirty (30) calendar days prior to date of termination.  The Employee's termination becomes effective only upon the Employee's return to point of hire.  Employees so terminated shall be required to work in accordance with the terms of the individual Employment Agreement until transportation is made available from Wake Island.  Employees not receiving thirty (30) calendar days notice prior to their return to the point of hire shall be paid normal wages in lieu of notice not to exceed thirty (30) calendar days on a prorated share for the days not worked.  In addition, the Employee shall be paid all earned vacation as provided for in paragraph 5(d) of this Agreement.

Intelcom's contract with the Air Force was scheduled to expire on September 30, 1986.  In 1986, the Air Force accepted competitive bids from many sources for the 1986–90 Base Services Contract.  The Philippine Overseas Employment Agency ("POEA"), which had sole authority to negotiate employment agreements for the Filipino workers and insisted on long-term wage escalation, refused to negotiate an employment agreement until after the Air Force announced the low bidder.  Intelcom submitted two bids, one with the Filipino workers and a lower bid with Thai workers, which the Air Force accepted.  A new contract was awarded and took effect October 1, 1986.  The old contract referenced by number in the employment agreements with the Filipino workers expired.

Intelcom gave initial notice to Plaintiffs on July 14, 1986, via letter explaining that the POEA's refusal to reduce its proposed wage escalation led to the unhappy outcome.  Intelcom gave Plaintiffs official notice on August 16 via letter stating in part:  "In accordance with your personal contract, please be advised your 30 day notice of termination is now in effect and your transportation to Clark AFB, Philippine Islands will depart on or about 15 September 1986."  Intelcom paid all vacation and transportation costs due under the individual agreements.

Plaintiffs, however, objected and made written protest of their discharge, claiming that the expiration of Defendant's contract with the Air Force was not a "termination" or a "curtailment" of the contract as envisioned in the employment agreements. Plaintiffs also noted that they expected Christmas bonuses and severance pay specified by the Treaty. According to Article II, section 7 of the Treaty:

> *Additional benefits*—Employees shall receive as a minimum, in addition to their basic wages, the following benefits:
>
> . . . . .
>
> (c) Christmas bonus: Equivalent to one-half month's pay, which shall be computed on base pay, overseas differential, and subsistence allowance.
>
> . . . . .
>
> (d) Severance pay: Except when separation is for cause, severance pay benefits shall be granted to those employees whose employment is terminated involuntarily, including termination by reduction in force caused by disestablishment or deactivation of a function, activity, or command.

Intelcom paid no Christmas bonuses. It did give at least 30 days notice according to the severance pay section in the individual agreements, but Plaintiffs claim that this did not suffice according to the Treaty.

## ANALYSIS

While the parties and the court have referred to the action below as a bench trial, there were no fact issues. The parties contested only issues of law. The district court stated in its ruling from the bench that "[t]his may in retrospect have been a summary judgment case ..." As this was a trial on stipulated facts, we review it as we would a summary judgment because findings of law in bench trials are reviewed *de novo*. *Seal v. Knorpp,* 957 F.2d 1230, 1234 (5th Cir.1992).

I. *The Treaty is not Self–Executing as to Plaintiffs.*

As did the district court, we note that

> [t]reaties made by the United States are the law of the land, U.S. Const. art. VI, but if not implemented by appropriate legislation they do not provide the basis for a private lawsuit unless they are intended to be self-executing.... Whether a treaty is self-executing is an issue for judicial interpretation, Restatement (Second) of Foreign Relations Law of the United States, § 154(1) (1965), and courts consider several factors in discerning the intent of the parties to the agreement: (1) the language and purposes of the agreement as a whole; (2) the circumstances surrounding its execution; (3) the nature of the obligations imposed by the agreement; (4) the availability and feasibility of alternative enforcement mechanisms; (5) the implications of permitting a private right of action; and (6) the capability of the judiciary to resolve the dispute.

*Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 373 (7th Cir.1985) (human rights articles of United Nations Charter and provisions of Helsinki Accords concerning contacts and regular meetings and reunification on basis of family ties are not self-executing).

As the Treaty in question is devoid of language indicating that individuals may have recourse to the courts of the United States to enforce its terms, we must examine its language to determine whether the parties intended to provide private rights to employees of contractors.

The parties do not dispute that the Treaty distinguishes between Filipinos hired directly by the U.S. Military and those hired by contractors. Article I defines "employer(s)" as "the United States Military Forces." The Article further defines "employees" as "Philippine citizens recruited by "employers' for work in offshore areas ..." "Contractors," on the other hand, are defined as

> enterprises (including sub-contractors but not including companies which have vendor contracts which only provide supplies through purchase orders, or companies which only perform incidental services) under contract with the United States Government who may wish to recruit Philippine citizens in the Philippines for employment or re-employment in the offshore areas defined herein. The term shall not apply to any work or service not performed for the United States Government.

> The section of Article II of the Treaty outlining benefits over and above minimum basic wage, such as Christmas bonuses, explicitly applies to "employees," which are, by the treaty's terms, those hired directly by the military. With regard to rights of contract hires, Article V of the Treaty provides:

Employment contracts between contractors and Philippine citizens recruited shall be consistent with the standards and terms established in this Agreement. The U.S. Military Forces or U.S. Government civilian agencies, as appropriate, shall inform all contractors recruiting workers in the Philippines for employment in the offshore areas of the terms of this Agreement and shall advise them to submit standard contracts of employment or reemployment to the Government of the Philippines for its approval. The Government of the Philippines shall have the responsibility of insuring that such contracts are consistent with the provisions of this Agreement.

In accordance with this provision, Intelcom submitted its standard employment agreement to the POEA, the Philippine agency charged with enforcing the Treaty, and the POEA approved the agreements despite their lack of a provision for extra benefits, such as Christmas bonuses. At first blush, it would appear that Plaintiffs' contention is that the POEA erred in approving the contracts. At oral argument, however, counsel for Plaintiffs stated that the POEA did not err because it expressly stated to Intelcom that its Filipino employees were to be given all the existing benefits then given on Wake Island to Filipino employees. These included necessarily, according to Plaintiffs, all benefits that would be granted to "employees" under Article II.

This argument is clearly circular. Moreover, the Intelcom employment agreements are virtually identical to those which the Filipino workers had signed with Intelcom's predecessor, Kentron, which apparently did not provide for extra benefits. Furthermore, Plaintiffs admit that there were no Filipino "employees" working directly for the Military at Wake Island who would have received the benefits specified under Article II. Therefore, it would seem that Intelcom did provide the benefits prevailing on Wake Island.

Plaintiffs argue that Treaty Article V's instruction that "[e]mployment contracts between contractors and Philippine citizens recruited shall be consistent with the standards and terms established in this Agreement" means that contract hires have a private right of action if they fail to receive benefits granted to "employees" under Article II even if their individual contracts provide no such benefits. Even if we were to read "consistent with" as "identical with," the Treaty would still not indicate a private right of action for contract hires. The language explicitly states that it is the responsibility of the Government of the Philippines to make sure that employment contracts conform

to the Treaty.  Intelcom submitted its standard agreement to the POEA as required.  If the Philippine Government informs the contractor that its contract conforms to the Government's interpretation of the Treaty, that ends the matter.  Moreover, we do not read the words "consistent with" as indicating that the Treat y bars the POEA from bargaining away benefits that would normally be awarded to "employees" of the U.S. Military.

In this respect, we find it instructive that, as counsel for Plaintiffs admitted at oral argument, the POEA only approves contracts for contract hires;  it does not involve itself in contracts for "employees."  If Filipino workers believe that their contracts are inconsistent with and violative of the Treaty, their recourse is to the POEA.  Moreover, if the POEA disagrees with the United States in interpreting the Treaty, Article IV, entitled Joint Consultation, provides:

> In case of any dispute by official agencies of either Government concerning interpretation or implementation of this Agreement, either Government may request consultation with the other and the two Governments may, if the dispute is agreed to be of sufficient concern to justify formal review, constitute a special joint committee for the purpose of seeking resolution of the dispute.

With regard to the *Frolova* factors, the language of the Treaty, as described above, nowhere indicates that there should be a private right of action to enforce obligations over and above the approval of the POEA.  Rather, the Treaty clearly envisions processes other than resort to the judiciary.  Moreover, the general purposes of the Treaty as described in its Preamble do not indicate that its framers intended to establish self-executing private rights:

> Desiring to establish general provisions more appropriate to present circumstances and better suited to serve the current needs and interests of the two Governments;
>
> Noting that large numbers of Philippine citizens are recruited in the Philippines for employment in certain areas of the Pacific and Southeast Asia;
>
> Noting that their common interests in the development and defense of the Pacific area require an assured and orderly supply of labor;
>
> Recognizing the desire of the two Governments to promote and maintain sound and equitable recruitment and employment practices and conditions of work;

This language clearly indicates that the main purpose of the Treaty is for the orderly recruitment of Filipino workers to promote the mutual security and economic development of both states. Private rights are not implicated. Therefore,

> we find that the provisions here in issue were not addressed to the judicial branch of our government. They do not by their terms confer rights upon individual citizens; they call upon governments to take certain action.

*Diggs v. Richardson,* 555 F.2d 848, 851 (D.C.Cir.1976) (United Nations Security Council resolution barring member nations from dealings which impliedly recognized South African occupation of Namibia is not self-executing) (footnote omitted).

Notwithstanding that "[a] treaty is primarily a compact between independent nations [which] depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it ..." *Edye v. Robertson (The Head Money Cases),* 112 U.S. 580, 598, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884), plaintiffs argue that we should give the Treaty a more liberal interpretation. Plaintiffs point out that we have stated that, in interpreting treaties,

> [w]e proceed ... under the admonition that where a treaty admits of two constructions, one restrictive of and the other favorable to rights claimed under it, the latter is to be preferred.

*Board of County Commissioners v. Aerolineas Peruanasa, S.A.,* 307 F.2d 802, 807 (5th Cir.1962), *cert. denied,* 371 U.S. 961, 83 S.Ct. 543, 9 L.Ed.2d 510 (1963).

Plaintiffs cannot prevail in this argument. Accepting *arguendo* that the Treaty is ambiguous and admits of two constructions, one providing for self-executing private rights and another not so providing, we would have to accept the interpretation of the Department of Defense, the U.S. Government agency charged with enforcing the Treaty. While we continue to adhere to *Board of County Commissioners,* we must also look to more recent legal developments, notably in the area of administrative law. Over the past several years, the federal courts have attempted to extricate themselves from the morass of public policymaking and have gone to great lengths to achieve this

end. Now, despite the fact that Congress has expressly stated that the federal courts shall decide all issues of law regarding administration, 5 U.S.C. § 706 (1988), the courts of the United States now regard ambiguities in federal law as implicit delegations of authority to administering agencies whose interpretations of those ambiguities must be accepted if reasonable. The seminal case is, of course, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., et al.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (courts must accept EPA's interpretation of antipollution statute as it is reasonable).

Of course, the statutes dealt with by *Chevron* and its progeny are those passed by both houses of Congress. Treaties are negotiated by governments and ratified by the U.S. Senate. Yet, as mentioned *supra,* they are regarded as law. *See Edye v. Robertson (The Head Money Cases),* 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). Moreover, there is little reason for the courts to give less deference regarding interpretations of treaties than those regarding statutes. If ambiguities in statutes drafted by Congress are to be regarded as implicit delegations of authority to the executive, there is no reason not to regard ambiguities in treaties as conscious delegations of authority to the very executive who co-drafted the treaties. We note that the federal courts have long been loathe to involve themselves in matters of foreign policy, preferring to leave such issues to the Executive Branch. Therefore, we have always given substantial weight to the interpretation of a treaty by the government agency charged with interpreting it. *See United States v. Postal,* 589 F.2d 862, 883 (5th Cir.) (article 6 of the Convention on the High Seas is not self-executing), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). This is because, as implicitly recognized in the last factor of the *Frolova* test, the courts are well equipped to resolve questions of domestic law but venture into unfamiliar territory when interpreting ambiguous treaties negotiated with foreign governments. Therefore, we must defer to the interpretation of the Department of Defense regarding the Treaty as long as such interpretation is reasonable.

According to the affidavit of William F. Coakley, Deputy Director for Compensation and

Overseas Employment Policy in the Department of Defense:

> [I]t is the interpretation of the [Department of Defense] that the Off–Shore Labor Agreement does not apply directly to employees of contractors for United States forces; that the Agreement makes a clear distinction between employees of the United States military forces, "direct hire employees," and employees of contractors; that the Off–Shore Labor Agreement requires only that U.S. Government contracting agencies advise contractors to submit standard contracts of employment or reemployment of Philippine citizens recruited in the Philippines to the government of the Philippines (Department of Labor) for its approval; that the government of the Philippines negotiates the terms of employment of its citizens with the contractors; and that while it can be expected that the government of the Philippines will attempt to include all the provisions of the Agreement pertaining to direct hires in the contractor employment contracts, there is no requirement that contractors accept the detailed provisions and contractors should approach the problem on the basis of bilateral negotiations between the Government of the Philippines and contractors.

For the reasons described above, this interpretation appears to us to be reasonable. Thus, even if we accept that the Treaty might be read as creating private rights of action, we must defer to the interpretation of the Department of Defense.

Therefore, we find that the district court correctly held that the Treaty does not establish private rights enforceable by Plaintiffs.

II. *Intelcom did not Improperly Terminate Plaintiffs.*

Plaintiffs' complaint that Intelcom terminated them improperly sounds in state law. There is a question, not addressed to us by the parties, over whether we have subject matter jurisdiction over this claim. At oral argument, we asked counsel for Plaintiffs what the basis for jurisdiction would be for this claim if we decided that they had no claim under the Treaty. Counsel replied that we would have diversity jurisdiction. We replied to counsel that even if Plaintiffs could otherwise qualify under 28 U.S.C. § 1332(a)(2), we had doubts as to whether all or even any of the 146 plaintiffs could meet the amount in jurisdiction requirement,[1] *a fortiori* in the absence of any valid

---

[1]At the time Plaintiffs commenced this action, the jurisdictional amount was $10,000. Congress has since amended 28 U.S.C. § 1332(a) and mandated that the jurisdictional amount be $50,000. *See* Judicial Improvements and Access to Justice Act, Pub.L. No. 100–702, Title II, § 201(b), 102 Stat. 4642, 4646.

claim for Christmas bonuses. Counsel for Plaintiffs stated that the jurisdictional amount would be no problem because the combined sum of the complaints of the 146 would be more than the jurisdictional amount. We cannot permit such aggregation, however. These plaintiffs are each suing on their own contract, and must each individually satisfy the jurisdictional amount. *Zahn v. International Paper Company,* 414 U.S. 291, 294–95, 94 S.Ct. 505, 508–09, 38 L.Ed.2d 511 (1973). The record indicates that Plaintiffs had not determined the exact amount of each plaintiff's claim. Such a problem could necessitate a remand.

Another possible basis for jurisdiction exists, however. At the time that Plaintiffs filed this action, substantial case law existed indicating that federal courts could adjudicate state law claims providing that they were closely related to federal claims and arose from a common nucleus of operative fact. This was the familiar doctrine of "pendent jurisdiction." *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The viability of pendent jurisdiction, at least in regards to the addition of parties not subject to a federal claim, was thrown into serious doubt after the filing of the instant case but prior to its resolution. *See Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989).

The state claim before us relates more to pendent claim than pendent party jurisdiction. Such claims, however, may not have been viable after *Finley* if the district court had dismissed underlying federal claim. Congress subsequently re-established pendent jurisdiction. *See* 28 U.S.C.A. § 1367 (West Supp.1991). This statute, however, affects only cases filed on or after December 1, 1990. *See* Civil Justice Reform Act of 1990, Pub.L. 101–650, Title III, § 310(c), 104 Stat. 5089, 5113, 5114. This case may have fallen through a jurisdictional hole in time.

In general, questions of subject matter jurisdiction are of paramount importance and should be resolved before the court reaches the merits of a claim. The issue is not so important here, however. Congress reacted quickly to restore supplemental jurisdiction in the wake of *Finley,* so the

jurisdictional hole is small. Moreover, even if the district court erred in reaching the merits of the wrongful termination claim, a jurisdictional question that we do not decide here, *see* 28 U.S.C.A. § 1367(c)(3) (West Supp.1991), the possible error was harmless because, as the district court found, Plaintiffs' contentions lack merit.

Plaintiffs contend that, according to the employment agreements, Intelcom could terminate Plaintiffs' contracts only if Intelcom's contract with the Air Force was "terminated." Plaintiffs read this to mean that the government contract would have had to end prior to its expiration in order for the employment contracts to be terminable. Intelcom disputes this, arguing that section 6(a) of the employment agreements allowed it to terminate Plaintiffs' contracts whenever the government contract ended, for whatever reason, including expiration according to its terms.

It is important to note at the outset that neither party contends that the employment agreements were ambiguous, and a disagreement as to their meaning does not render them so. Construction of an unambiguous contract by a trial court in a bench trial presents a question of law which we review *de novo. Cotton Bros Baking v. Industrial Risk Insurers,* 941 F.2d 380, 385 (5th Cir.1991), *corrected,* 951 F.2d 54 (5th Cir.), *cert. filed,* April 16, 1992.

As noted *supra,* section 6(a) states, in pertinent part:

> In the event that the Employer's contract with the United States Government for service on Wake Island is terminated or otherwise curtailed for any reason or, if a general reduction in the work force becomes necessary, the Employer may terminate his individual Employment Agreement with the Employee ...

We agree that this contract clause is unambiguous, especially in light of the fact that section 1 of the employment agreements reads:

> The employee agrees to perform these services to the best of his ability ... so that his Employer can fulfill its contractual obligations to the United States Government under Contract Number F64605–83–C–0050.

The plain language of the contract indicates that Intelcom had the right to terminate the individual employment agreements whenever the particular contract specifically referenced in the agreements ended, for whatever reason.

Plaintiffs argue that "terminate" cannot mean "expire." Plaintiffs cite *Davis v. Gulf Oil Corp.*, 572 F.Supp. 1393 (C.D.Calif.1983). In that case, a holder of a service station franchise sued the oil company for refusing to continue the franchise under the terms of their old agreement. The station operator claimed that this violated California Business and Professions Code § 20999.1, which prohibits certain terminations of franchises absent good cause. The district court, citing the California Court of Appeal, noted that *in this context,* terminations must involve some period of time according to the contract of which the injured party was deprived, and did not apply to a franchise operator who was unhappy with a new contract offered upon expiration of the old franchise. *Id.* at 1398–99. The district court in that case clearly limited its reasoning to one particular context, a context which does not apply to the facts presented to us in the case now before us.

Plaintiffs also cite *Pitney–Bowes, Inc. v. Mestre,* 517 F.Supp. 52 (S.D.Fla.1981), *dism'd in part and aff'd in part on other grounds,* 701 F.2d 1365 (11th Cir.), *cert. denied,* 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983). In that case, a licensee of patents and trade secrets brought an action for declaratory judgment of rights and obligations under certain license agreements. The licensor argued that under the agreements, expiration was a form of termination which would cause the right to use trade secrets to revert to the licensor. The court disagreed, finding that expiration was not synonymous with termination. *Id.* at 64. The district court in that case, however, based its reasoning on the clear wording of the contract, which stated "that the expiration of this agreement, or its termination pursuant to terms hereof, ..." *Id.* The court reasoned that since the contract employed both terms, they could not be synonymous, apparently unless "expiration" was a nullity. In the contract before us, however, "expiration" is not employed.

Even if we agreed that "terminate" cannot mean "expire," the contract clearly goes beyond the word "terminate" to make clear that it refers to any conclusion of the government contract. Therefore, we find no contract violation.

Plaintiffs also argue that Intelcom cannot now maintain that it terminated the contracts because the government contract expired, when in the July 14, 1986 letter to Plaintiffs, Intelcom stated that the employment agreements were to be terminated because of the failure of wage negotiations with the POEA. Plaintiffs rely on our statement that "[i]n Texas when an employer assigns grounds for discharge of an employee, it cannot later justify the termination on grounds that were not made the basis of the termination at the time of the discharge." *Measday v. Kwik–Copy Corp.,* 713 F.2d 118, 125–26 (5th Cir.1983). This argument is meritless. Intelcom maintains that the government contract was not renewed due to the failure of the wage negotiations. Intelcom has not relied on some alternate reason for discharging Plaintiffs.

Finally, Plaintiffs contend that the district court erred in admitting testimony from Intelcom's expert witness to the effect that "terminate" can mean "expire" notwithstanding that neither party had claimed ambiguity. As we have decided that the employment agreements are unambiguous and that expiration of the government contract qualifies as a reason for terminating them, any error in this regard was harmless.

CONCLUSIONS

In regards to employees of contractors, the Treaty is not self-executing and therefore Plaintiffs have no standing to complain in federal court that they did not receive benefits of which they believe the Treaty assures them. Moreover, the employment agreements clearly indicate that they are terminable if the underlying government contract ends, for whatever reason. Therefore, the judgment of the district court is

AFFIRMED.