Guy VON DARDEL, on his own behalf and on Behalf of his half brother, Raoul Wallenberg, and Sven Hagstromer, Legal Guardian of Raoul Wallenberg, on Behalf of Raoul Wallenberg, Plaintiffs,

v.

UNION OF SOVIET SOCIALIST REPUBLICS, Defendant.

Civ. A. No. 84–0353.

United States District Court, District of Columbia.

Oct. 15, 1985.

Anthony D'Amato, Northwestern University School of Law, Chicago, Ill., Joseph W. Dellapenna, Villanova University School of Law, Villanova, Pa., Jerome G. Snider, Davis Polk & Wardwell, Washington, D.C., Guy Miller Struve, Jo R. Backer, John G. Rich, Whitney L. Schmidt, Davis Polk & Wardwell, Murray S. Levin, Alan K. Cotler, Erik N. Videlock, Martha A. Toll, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiffs.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this proceeding declaratory and injunctive relief and damages are sought against the Union of Soviet Socialist Republics ("Soviet Union" or "USSR") for the unlawful seizure, imprisonment and possibly death of Raoul Wallenberg, a Swedish diplomat. The complaint is brought on behalf of Wallenberg by Guy Von Dardel, his half brother, and Sven Hagstromer his legal guardian. Guy Von Dardel and Sven Hagstromer are Swedish citizens. Hagstromer was appointed guardian of Wallenberg's legal interests by the District Court in Stockholm, Sweden.

The plaintiffs allege that in 1945, Raoul Wallenberg was arrested in Budapest, Hungary by representatives of the Soviet Union and that since then he has suffered imprisonment and possibly death. At the time of his arrest he was acting at the initiation of the United States government in an attempt to save the Jewish population in the Budapest ghetto from deportation to Nazi extermination camps. If these allegations are true, they violated Wallenberg's diplomatic immunity, the laws and treaties of the Soviet Union and the United States, and the law of nations.

### BACKGROUND [1]

During the course of World War II, the United States Government, in an effort to save from extermination by the German Nazis the thousands of Jews then domiciled in Hungary, sought the assistance of Sweden, a neutral nation. This was an effort that the United States could not undertake alone. Because the United States was at war with Hungary, its diplomatic presence was withdrawn. Raoul Wallenberg agreed to join the Swedish Legation in Budapest, and to otherwise cooperate with the efforts of Sweden and "to act at the behest of the United States." Joint Resolution of Congress declaring Raoul Wallenberg to be an honorary citizen of the United States, Pub.L. No. 97–54, 95 Stat. 971 (1981) ("Joint Resolution").[2]

---

1. The facts in this proceeding are based on statements of USSR officials, official actions taken by the United States Congress, reports and resolutions of House and Senate Committees and official actions taken by the President. The plaintiffs have filed voluminous appendices in this proceeding.

2. Mr. Wallenberg became the second person to be voted by Congress an honorary citizen. Winston Churchill was the first. Representative Thomas Lantos of California, a Hungarian Jewish refugee is credited with taking the initiative in making Wallenberg an honorary American citizen. New York Times, April 13, 1985, p. 9.

Granted full diplomatic status by Sweden, and funded by the United States, Wallenberg arrived in Budapest, Hungary, in July 1944. While stationed there, he served as Secretary of the Swedish Legation and was entitled to full diplomatic immunity. In the next six months, until his arrest by Soviet officials, Wallenberg saved the lives of nearly one hundred thousand Jewish persons providing them with funds and other means of support provided by the United States. While in Budapest he became the counterforce to the notorious German Nazi—Adolf Eichmann. His efforts to save Hungary's Jews from extermination were described in a Senate Report:

> He printed and issued thousands of Swedish protective passports of his own design. He purchased and rented scores of houses in Budapest, declared them to be Swedish Embassy property and equipped them with Swedish flags, and protected and cared for the refugees he gathered within these safe houses. Risking his own life time and time again, Wallenberg followed the "Death Marches" and went daily to the deportation trains where he literally pulled people out of the clutches of the Nazis. And, when the Nazis decided to blow up the ghetto in Budapest and all its inhabitants with it, Wallenberg confronted the Nazi leaders (Adolf Eichmann), threatened to see to it personally that they were hanged as war criminals if they proceeded with their plan, and thus prevented its execution.

S.Rep. No. 97–169, 97th Cong., 1st Sess. at 2 (1981) ("Wallenberg Senate Report").

Hungary was later overrun by the Soviets and in early 1945, Wallenberg was arrested by their occupation forces in Budapest. From that time forward, his precise whereabouts and his status within the Soviet Union have not been ascertained. In a note dated August 18, 1947 and delivered to the Swedish Embassy in Moscow by Soviet Foreign Minister, Andrei Ya Vyshinsky it was asserted that "[a]s a result of a thorough investigation it has been established that Wallenberg is not in the Soviet Union and he is not known to us." Affidavit in Support of Plaintiffs' Motion for Default Judgment—Guy Miller Struve, co-counsel for plaintiffs (June 17, 1984) Ex. D ("Struve Affidavit").

Ten years later, however, in response to renewed diplomatic inquiries based on the testimony of persons released from Soviet prisons that Wallenberg was still alive, Deputy Foreign Minister Andrei A. Gromyko admitted that Wallenberg had been a prisoner in the USSR. He further stated that while imprisoned, Wallenberg had died of natural causes on July 17, 1947. In a note dated February 6, 1957, delivered to the Swedish Embassy in Moscow, Gromyko described the detention of Wallenberg, and the misinformation which made the detention possible, as "criminal activity," and attempted to fasten the blame for it upon Viktor S. Abakumov, a former Minister of State Security who died in 1953.

> Raoul Wallenberg was apparently among other persons detained in the area of the military operations of the Soviet forces. At the same time it may be considered indubitable that the subsequent detention of Wallenberg, and also the incorrect information about him which was given by certain former leaders of organs of state security to the Ministry of Foreign Affairs of the USSR over the course of a number of years, were the result of criminal activity of Abakumov. As is known, in connection with the grave crimes committed by him, Abakumov, acting in violation of the laws of the USSR and striving in every possible way to inflict harm on the Soviet Union, was condemned and shot by order of the Supreme Court of the USSR.

> The Soviet Government sincerely regrets what has occurred and expresses its deep condolences to the Government of Sweden and also to the relatives of Raoul Wallenberg.

Struve Affidavit, *supra*, Ex. F, pp. 2–3.

However, between 1954 and 1981, a steady flow of reports from former Soviet prisoners indicate that Wallenberg did not

die as claimed in the Gromyko note. To the contrary, the reports suggest that Wallenberg remained alive and in the defendant's custody after 1947. Joint Resolution, *supra*.

There is insufficient evidence before the Court to support a definitive finding as to whether at this time, Wallenberg is dead or alive. While the USSR has continuously represented that Wallenberg died in 1947, those representations are inconsistent with and at odds with credible and uncontroverted evidence presented by the plaintiffs in this proceeding and they are rejected. On basis of the record here presented, the Court finds that the Soviet Union has always had knowledge and information about Wallenberg; that it has failed to disclose and has concealed that information; and that otherwise, defendant's representations are suspect and should be given little, if any, credit. If alive, Wallenberg would be 72 years of age and he would have been held in custody for nearly 40 years.

The complaint in this proceeding was filed with this Court in February 1984. A request for documents relevant to the issue of jurisdiction was filed along with the complaint. The summons, complaint and discovery request, together with a notice of suit and Russian translations of the documents, were regularly processed through the United States Department of State. The packet of documents was then delivered to and served upon the Soviet Ministry of Foreign Affairs in Moscow in accordance with the Foreign Sovereign Immunities Act ("FSIA" or "Act"), 28 U.S.C. § 1608(a)(4). On May 1, 1984, a certified copy of the diplomatic note evidencing service of the documents was filed by the Department of State with the Clerk of this Court.

The defendant's time to answer or otherwise respond to the complaint expired on June 1, 1984. The Soviet Union did not respond to either the complaint or the document request. On April 19, 1984, the Soviet Ministry of Foreign Affairs returned all of the documents to the United States Embassy in Moscow, together with a note asserting absolute sovereign immunity from suit in non-Soviet courts. Struve Affidavit, *supra*, ¶¶ 4–6 and Ex. B.

Under the circumstances, it is appropriate to consider the plaintiff's application for a default judgment. In the discussion which follows, the Court will address first, the questions of jurisdiction, venue, and statute of limitations. It will then address the merits of the litigations and an analysis of the issues arising under the substantive law. This Court's factual findings are supported by a satisfactory, substantial, and well documented record.

## JURISDICTION AND VENUE

Several sections of Title 28 United States Code allow this Court to exercise jurisdiction over this action. Under Section 1330(b) of the Foreign Sovereign Immunities Act, personal jurisdiction is present when the defendant may be found in the United States, through its agents and instrumentalities, and because defendant has been duly served with process pursuant to 28 U.S.C. § 1608(a)(4) (Struve Aff., *supra*, ¶ 3 and Ex. A). Because this is a civil action arising under the "laws, or treaties of the United States," subject matter jurisdiction under FSIA is appropriate pursuant to Sections 1330(a) and 1331. *Letelier v. Republic of Chile*, 502 F.Supp. 259, 266 (D.D.C.1980). Additional reasons to support this conclusion are discussed ante at p. 11. Finally, this Court may exercise subject matter jurisdiction over this proceeding under the Alien Tort Claims Act, 28 U.S.C. § 1350 because it is a "civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 813–14 (D.C.Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985), opinion Bork, J.; *Letelier*, 502 F.Supp. at 266.

Venue is appropriate in the United States District Court for the District of Columbia because the defendant is a foreign state, 28 U.S.C. § 1391(f)(4).

### The Foreign Sovereign Immunities Act, 28 U.S.C. § 1602

This Court has subject matter and personal jurisdiction under the Foreign Sover-

eign Immunities Act. Under the Act, a foreign state is generally immune from the jurisdiction of federal courts, 28 U.S.C. § 1604, subject to a number of exceptions and limitations set forth at §§ 1604 and 1605. Section 1604 provides that the immunity afforded by the Act is "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of [the] Act." Section 1605(a) sets forth several categorical exceptions to immunity, including situations in which the sovereign defendant has waived immunity, § 1605(a)(1), situations involving certain commercial activity or property in the United States, § 1605(a)(2)–(4), and certain noncommercial torts committed by the foreign state or its agent, § 1605(a)(5).

The Act provides the district courts with subject matter jurisdiction over civil cases against foreign governments where immunity is not appropriate under its terms. 28 U.S.C. § 1330(a). Moreover, where the requirements of subject matter jurisdiction have been met and proper service has been made, the Act operates to create personal jurisdiction over the foreign government defendant. 28 U.S.C. § 1330(b).[3] The absence of immunity thus establishes both subject matter and personal jurisdiction over a case against a foreign government. *See, e.g., Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 851 (S.D.N.Y. 1978).[4]

In 1976, Congress had a twofold purpose for enacting the Foreign Sovereign Immunities Act: (1) to liberalize the law of immunity by adopting and codifying the doctrine of "restrictive" immunity, and (2) to assure consistent application of the law of sovereign immunity by eliminating the partic-

ipation of the executive branch of the government so as to "assur[e] litigants that ... decisions are made on purely legal grounds and under procedures that insure due process." H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 7 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6606 ("House Report"). To accomplish these objectives, the Act established a set of legal standards governing claims of immunity in civil actions against foreign states. These standards were explicitly intended to incorporate established principles of international law regarding the immunity of sovereigns. House Report, at 14, 1976 U.S.Code Cong. & Ad.News at 6613.

According to the drafters of the FSIA, "sovereign immunity is an affirmative defense which must be specially pleaded, [and] the burden will remain on the foreign state to produce evidence in support of its claim of immunity." House Report, *supra,* at 17, 1976 U.S.Code Cong. & Ad.News at 6616. Thus, the burden of demonstrating that immunity exists rests upon the foreign state. *See, e.g., Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1378 (5th Cir.1980). In the absence of an appearance by the defendant, however, the Court must make an independent determination that it has subject matter jurisdiction. *See, e.g., Letelier v. Republic of Chile,* 488 F.Supp. 665, 667 (D.D.C.1980).

The plaintiff cites five independent reasons why the USSR should not enjoy immunity in this case. The Court has taken note of all these arguments but finds the first four far more compelling than the last. The reasons are as follows: First, by virtue of its decision to default, the USSR failed to raise the defense of sovereign immunity.

**3.** A court's assertion of jurisdiction over a defendant pursuant to § 1330(b) must also comport with minimum jurisdictional contacts and due process as required by *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292–93, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980); *Kulko v. California Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). *See also Gilson*

*v. Republic of Ireland,* 682 F.2d 1022, 1028 (D.C. Cir.1982). These minimum requirements are clearly satisfied because the defendant maintains a substantial presence in this District.

**4.** As a threshold matter, it is noted that the Supreme Court has upheld the constitutionality of the FSIA's authorization of suits by foreign plaintiffs against foreign states. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 490, 103 S.Ct. 1962, 1969, 76 L.Ed.2d 81 (1983).

Second, the FSIA incorporates preexisting standards of international law, under which a government is not immune for certain acts in clear violation of the universally accepted law of nations. Third, the FSIA is limited by treaties to which the United States is a party; the USSR cannot claim immunity under the FSIA for acts which constitute violations of certain of those treaties, to which the USSR is also a party. Fourth, the USSR waived immunity in this action, and is therefore not entitled to raise it as a defense, pursuant to 28 U.S.C. § 1605(a)(1). And, fifth, the actions of the USSR constitute non-commercial torts within the meaning of 28 U.S.C. § 1605(a)(5); immunity for commission of such is therefore inappropriate under the Act. A fuller discussion of the first four is set out below.

### A.

■ Under the FSIA, sovereign immunity is an affirmative defense that must be pleaded and proved by the sovereign defendant. These obligations were made clear in the documents which were served upon the Soviet Union. Included among them was an explanatory notice of suit and the full text of the FSIA, both with Russian translation. The transmittal note from the United States Embassy accompanying the papers underscored the procedures:

> Please note that under United States law and procedure, neither the Embassy nor the Department of State is in the position to comment on the present suit. Under the laws of the United States, any jurisdictional or other defense including claims of sovereign immunity must be addressed to the court before which the matter is pending, for which reason it is advisable to consult an attorney in the United States. (Struve Aff., Ex. A.)

Moreover, because of prior involvement in FSIA litigation, the procedure is one with which the Soviet Union is fully familiar. Indeed in several reported cases in which the USSR has been a defendant since the passage of the Act, it has appeared through counsel for the purpose of contesting jurisdiction.[5] *See Bland v. Union of Soviet Socialist Republics,* 17 Av.Cas. (CCH) 17,530 (E.D.N.Y.1982); *Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056 (E.D.N.Y.1979); *United Euram v. Union of Soviet Socialist Republics,* 461 F.Supp. 609 (S.D.N.Y.1978); *cf. In re Estate of Petro Seminiw,* 78 Ill.App.3d 570, 33 Ill. Dec. 731, 397 N.E.2d 64 (1st Dist.1979); *In re Estate of Bari Nabif,* 69 A.D.2d 904, 415 N.Y.S.2d 901 (2d Dept.1979).[6] However, in this proceeding, the USSR has chosen to default and to raise the issue of immunity not by a motion filed with the Court, but merely by a communication addressed to the United States Embassy in Moscow.

In *Letelier, supra,* 488 F.Supp. 665, 669 n. 4, this Court raised the question of whether such a diplomatic assertion of immunity, in lieu of "a formal appearance or the filing of a pleading," could suffice to raise the defense of sovereign immunity. In that case, the foreign state defendant sent a diplomatic note to the Department of State challenging the jurisdiction of the Court. The Court declined to rule on the sufficiency of this method of raising the affirmative defense of immunity, because the Court found that it had subject matter jurisdiction "even assuming it has been pleaded properly." *Id.* at 670 n. 4.

The degree to which a foreign state is entitled to immunity under the Act is necessarily determined by the procedures set forth by Congress. Congress explicitly intended that sovereign immunity remain an "affirmative defense which must be specially pleaded, the burden [remaining] on the foreign state to produce evidence in

---

**5.** The Soviet Union defaulted without comment in *Frolova v. Union of Soviet Socialist Republics,* 558 F.Supp. 358 (N.D.Ill.1983), *aff'd,* 761 F.2d 370 (7th Cir.1985).

**6.** The instrumentalities of the Soviet Union have also appeared when sued under the Act. *See Houston v. Murmansk Shipping Co.,* 667 F.2d 1151 (4th Cir.1982); *Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. 849 (S.D.N.Y.1978).

support of its claim of immunity." House Report, *supra*, at 17, 1976 U.S.Code Cong. & Ad.News at 6616. This allocation of the burden of proof was, in fact, one of the bases for Congress' decision to structure the Act as a presumption of immunity subject to a group of exceptions. *Id.*

In the present case, defendant has not only failed to plead immunity as an affirmative defense, but has chosen to raise immunity in a manner explicitly precluded by the Act. Prior to passage of the FSIA, the defense of immunity could be raised by diplomatic approaches to the Department of State. *See, e.g.*, House Report, *supra*, at 7, 1976 U.S.Code Cong. & Ad.News at 6605–06; *Ex Parte Muir*, 254 U.S. 522, 532–33, 41 S.Ct. 185, 187, 65 L.Ed. 383 (1921). It was the express purpose of the FSIA to remove the executive branch from the determination of such issues. By raising the issue of sovereign immunity in a diplomatic note, the USSR has knowingly chosen a procedure that is no longer available under United States law. As such, it cannot be recognized as an adequate pleading of the defense of immunity. *Ex Parte Muir, supra*, at 533, 41 S.Ct. at 187.

Having failed to raise immunity as an affirmative defense, or to provide even a bare allegation that its acts do not fall into one of the exceptions to the FSIA, defendant has deliberately chosen to forego whatever entitlement it might have had to immunity under the terms of the Act.[7]

### B.

The Foreign Sovereign Immunities Act, like every federal statute, should be interpreted in such a way as to be consistent with the law of nations. *See, e.g.*, *MacLeod v. United States*, 229 U.S. 416, 434, 33 S.Ct. 955, 961, 57 L.Ed. 1260 (1913). Congress explicitly anticipated such an interpretation, stating its intent that the Act "[incorporated] standards recognized under international law." House Report, *supra*,

at 14, 1976 U.S.Code Cong. & Ad.News at 6613.

Historically, when a nation has committed a clear and egregious violation of a well-established and universally recognized standard of international law, courts have recognized the need for an appropriate exercise of jurisdiction. In *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, 210 F.2d 375 (2d Cir. 1954), the court deferred to a press release issued by the Department of State in which the Department took the position that in cases seeking reparations for confiscations of property by Nazi officials, American courts should not be restrained by doctrines of international law that, under more routine circumstances, would require a court not to exercise jurisdiction or reach the merits of a claim. 210 F.2d at 375–76. Moreover, the doctrine of sovereign immunity has historically been based on principles of "grace and comity." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983). As such, the doctrine is inherently limited and appropriately disallowed where the foreign state defendant has acted in clear violation of international law.

In *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court held that the act of state doctrine barred consideration of the validity of a Cuban confiscation of property located in Cuba, basing its decision largely on the fact that there is some division in the international community regarding state expropriation of the property of aliens. ("There are few if any issues in international law today on which opinion seems to be so divided ..." 376 U.S. at 428, 84 S.Ct. at 940). In dissenting, Justice White urged that the act of state doctrine should not shield acts which are clearly violations of international law, even where (unlike the present case) such acts would otherwise be subject to the act of state doctrine:

> its discovery order but does not find it as persuasive as the others they have offered for consideration.

---

7. This Court notes plaintiff's further argument that this Court should find subject matter jurisdiction as a sanction for failure to comply with

The reasons for nonreview, based as they are on traditional concepts of territorial sovereignty, lose much of their force when the foreign act of state is shown to be a violation of international law. All legitimate exercises of sovereign power, whether territorial or otherwise, should be exercised consistently with rules of international law, including those rules which mark the bounds of lawful state action against aliens or their property located within the territorial confines of the foreign state.

376 U.S. at 457, 84 S.Ct. at 955–56.

The concept of extraordinary judicial jurisdiction over acts in violation of significant international standards has also been embodied in the principle of "universal" violations of international law. *See, e.g.,* Restatement of Foreign Relations Law of the United States (Revised) § 404 (Tent. Draft No. 2, 1981) ("A state may exercise jurisdiction to define and punish certain offenses recognized by the community of nations as of universal concern"). The concept of universal violations is not limited to criminal jurisdiction, but extends to the enforcement of civil law as well. *Id.* at Comment *b.*

■ Congress was fully aware of these doctrines of international law in 1976 when it adopted the FSIA, and meant to incorporate them into the statute.[8] The statute should be read, then, not to extend immunity to clear violations of universally recognized principles of international law.

---

8. The fact that the legislative history of the FSIA does not contain a specific reference to these doctrines is not surprising. Congress' primary concern was to codify jurisdictional standards relating to the burgeoning area of commercial litigation against foreign governments. House Report, *supra,* at 6, *reprinted in* 1976 U.S.Code Cong. & Ad.News at 6605. The codification was necessary in order to ensure that these more routine cases did not take on undue political significance through the sometimes inconsistent development of the common law, as influenced by the Executive. *See* discussion at pp. 10–11, *supra.*

9. In a footnote appended to the end of the majority opinion in *Persinger v. Islamic Repub-*

---

The violation of the diplomatic immunity of Raoul Wallenberg is such a violation. The ancient and universal consensus on diplomatic immunity places it squarely within even the most restrictive interpretation of the coverage of the Alien Tort Claims Act, 28 U.S.C. § 1350. *See* discussion at 258–59, *infra.* As such, the Congress in 1789 opened the district courts of the United States to suits by aliens claiming tortious violations of diplomatic immunity. Congress has also enacted statutes designed to protect internationally protected persons, including diplomats, 18 U.S.C. §§ 1116 and 1201, as to which a private remedy has been implied. *See* discussion at 257–58, *infra.* If the FSIA was interpreted to bar suits against foreign governments under § 1350, or to preempt the private rights created by §§ 1116 and 1201, it would act *pro tanto* to repeal these statutes.[9] Statutory interpretation that would effect such a repeal is not favored, *e.g., United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168–69, 181, 96 S.Ct. 1319, 1322–23, 1329, 47 L.Ed.2d 653 (1976), and is therefore rejected by this Court.

### C.

Section 1604 of the FSIA provides that immunity is "subject to" international agreements to which the United States was a party at the time of its enactment. Thus, where the substantive provisions of the Act would operate in a specific case to interfere with any such international agreement, such provisions must be preempted to the

---

*lic of Iran,* 729 F.2d 835 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984), Judge Bork (with Judge Edwards dissenting) rejected plaintiffs' argument that United States courts had jurisdiction over claims for damages arising out of the seizure of the American Embassy in Iran, although this seizure constituted an international crime. 729 F.2d at 843 n. 12 (D.C.Cir.1984). So far as the opinion reveals, Judge Bork did not consider the intent of Congress in enacting the FSIA to preserve existing remedies for violations of international law, as described above, or the effect of 18 U.S.C. §§ 1116 and 1201 or 28 U.S.C. § 1350.

extent necessary to permit the full operation of such agreement.[10] In this proceeding, both the United States and the Soviet Union are parties to two international agreements, the operation of which would be frustrated by any decision granting immunity to the Soviet Union: the Vienna Convention on Diplomatic Relations, April 18, 1961, and the 1973 Convention on Internationally Protected Persons.

The Vienna Convention and the 1973 Convention are both designed to protect diplomats from offenses against them. In order for the conventions to operate effectively, the perpetrators of such offenses must be subject to liability for their acts. To the extent that the FSIA would shield the Soviet Union from such liability, it is in conflict with the terms of the conventions and thwarts their effective operation. Under § 1604, the immunity granted by the FSIA must be limited so as to avoid such a result; in the present case, the Soviet Union must be denied immunity.

This result is particularly just since the Soviet Union is a party to both conventions. Under the Vienna Convention the USSR is pledged to protect the very rights it is violating. Under the 1973 Convention it is pledged to punish the very crimes it is committing. Moreover, the Soviet Union's unlawful treatment of Wallenberg was ongoing even as the Conventions were drafted and signed. Thus, it knowingly accepted the validity of legal standards that it knew at the time were being violated. Against such a backdrop, the denial of immunity against claims seeking relief for such violations does not seem unjust.

**D.**

Under § 1605(a)(1) of the FSIA, foreign states may waive immunity "either explicitly or by implication." According to the House Report, an example of an explicit waiver under the FSIA might be found in the form of a treaty obligation under treaties of friendship, commerce, and navigation. Neither the statute nor the legislative history, however, makes clear how immunity can be implicitly waived.[11]

The United States courts have not yet fully explored the proposition that by ratifying an international agreement a foreign state implicitly waives a defense of sovereign immunity against claims seeking compensation for acts which constitute violations of such agreements. In *Frolova v. Union of Soviet Socialist Republics,* 558 F.Supp. 358, 363 n. 3 (N.D.Ill.1983), *aff'd,* 761 F.2d 370 (7th Cir.1985), the court in dictum rejected plaintiff's argument that because the Soviet Union's refusal to permit plaintiff's husband to emigrate violated international and Soviet law, it had impliedly waived immunity. In *Siderman v. Republic of Argentina,* No. Civ. 82–1772–RMT (C.D.Cal. March 12, 1984), however, the court found jurisdiction over the Republic of Argentina for claims related to the torture of one of the plaintiffs "by applying the 'Law of Nations' concept." A number of legal scholars have examined this principle in the context of

---

**10.** The House Report would limit the immunity of a foreign state under the Act to cases of an express or manifest conflict between the provisions of the Act and those of an international agreement or treaty. House Report, *supra,* at 17, *reprinted in* U.S.Code Cong. & Ad.News at 6616. *See, e.g., Mashayekhi v. Iran,* 515 F.Supp. 41, 42 (D.D.C.1981). Given the clear and unambiguous language of the statute, however, resort to the legislative history is in this instance unnecessary for interpretative purposes. *See, e.g., Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978); *National Insulation Transportation Committee v. ICC,* 683 F.2d 533, 537 (D.C.Cir. 1982). This reading of the clear language of § 1604 is given further support by the language of 28 U.S.C. § 1330, which gives the federal courts jurisdiction over actions against foreign states with respect to which the foreign state is "not entitled to immunity" under the FSIA "or any applicable international agreement."

**11.** The House Report provides two illustrative examples of implied waivers—an appearance in court by the sovereign defendant, or an agreement by the sovereign defendant to arbitrate claims in another country. House Report, *supra,* at 18, 1976 U.S.Code Cong. & Ad.News at 6617. These examples, however, are not exclusive.

human rights violations,[12] and have concluded that a sovereign may implicitly waive its immunity for such violations when it ratifies human rights agreements. R. Lillich and F. Newman, *International Human Rights: Problems of Law and Policy* (1979); Comment, *The Foreign Sovereign Immunities Act and International Human Rights Agreements: How They Co-Exist,* 17 U.S.F.L.Rev. 71 (1982).

■ These conclusions are directly relevant to the present case, which involves violations not only of international human rights agreements but also of treaties codifying the fundamental principle of diplomatic immunity, which has been universally recognized as binding since before the times of Blackstone and de Vattel.[13] By explicitly agreeing to be bound by the terms of those agreements, the USSR has implicitly waived its immunity in this action alleging their breach. As Lillich and Newman have noted with respect to the United Nations Charter,

> it would be most difficult to conclude that the Charter provisions on human rights cannot legitimately be given effect by the courts in appropriate cases. Indeed, it would be contrary to the letter and the spirit of the supremacy clause of the Constitution if the courts did not attempt to carry out a treaty provision to the fullest extent possible.

R. Lillich and F. Newman, *International Human Rights, supra,* at 76. Any other result would rob each of those agreements of substantive effect, and would render meaningless the act of the Soviet Union in signing them.

## The Alien Tort Claims Act, 28 U.S.C. § 1350

■ The Alien Tort Claims Act, 28 U.S.C. § 1350, was enacted in 1789 by the First Congress of the United States. The section provides that the "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The statute vests this Court with subject matter jurisdiction over this proceeding and the right to determine liability for injuries resulting from violations of the diplomatic immunity of Raoul Wallenberg.

The Court of Appeals for this Circuit recently considered the application of § 1350 in *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984). That case involved a terrorist attack on an Israeli bus by members of the Palestine Liberation Organization. Plaintiffs, survivors of the attack and representatives of some of those killed, asserted jurisdiction under 28 U.S.C. §§ 1331 and 1350.[14] The District Court dismissed the case for lack of jurisdiction, and plaintiffs appealed. The Court of Appeals issued three opinions which affirmed the decision of the District Court, but each opinion stated separate grounds for reaching that result.

Judge Harry Edwards adopted the interpretation of § 1350 previously adopted by the Second Circuit in *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980), whereby proof of a tort in violation of international law as that law is currently understood establishes both a cause of action and jurisdiction in the District Court. Judge Robert Bork proposed a more narrow reading of the statute, arguing that the doctrine of

---

**12.** The importance of looking to the writing of legal scholars in this area of the law was explained by the Supreme Court in *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). *See also, e.g., Filartiga v. Pena-Irala,* 630 F.2d 876, 879 n. 4 (2d Cir.1980).

**13.** *Frolova v. Union of Soviet Socialist Republics,* 558 F.Supp. 358 (N.D.Ill.1983), *aff'd,* 761 F.2d 370 (7th Cir.1985), on the other hand, on one interpretation dealt with a legal right—the right to emigrate—on which there is not yet such

universal agreement among nations. *Cf. Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 813 (D.C.Cir.1984) (Bork, *J.* concurring).

**14.** The District Court held, and plaintiffs conceded, that with regard "to the role of the law of nations," the jurisdictional prerequisites of § 1331 were equivalent to those of § 1350. *Tel-Oren v. Libyan Arab Republic,* 517 F.Supp. 542, 549 (D.D.C.1981), *aff'd,* 726 F.2d 774, 800 (D.C. Cir.1983).

separation of powers should be seen to limit the effect of the statute to those violations of international law that were recognized as actionable in 1789 or to those which, though more recently established, explicitly entail a private right of action. Judge Roger Robb concurred on the ground that the political question doctrine precluded judicial consideration of the claims raised by the plaintiffs because the legal issues surrounding terrorism are complex and imprecise. It is clear that even under the narrowest of these standards proposed in *Tel-Oren,* or adopted in other forums—§ 1350 provides this Court with subject matter jurisdiction to determine the liability for the injury that has resulted from the violation of Raoul Wallenberg's diplomatic immunity.

### A.

In *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980), a former Paraguayan police official was sued by the father and sister of a young man whose death by torture he was alleged to have caused. The District Court dismissed the case, saying that although official torture violated emerging standards of international law, it was obliged by dicta in prior Second Circuit opinions to rule that § 1350 does not reach a state's behavior towards its own citizens.

On appeal, the Second Circuit reversed. Judge Kaufman wrote that the "law of nations," as used in the statute, is a developing body of principles which must be interpreted "not as it was in 1789, but as it has evolved and exists among the nations of the world today." 630 F.2d at 881.[15] Looking to the sources of international law enumerated by the Supreme Court in *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900)—"executive or legislative act or judicial decision" and the works of expert "jurists and commentators," 630 F.2d at 880—the court found that "the limitations on a state's power to torture persons held in its custody" constitute a principle on which the

opinion of civilized nations is so united as to raise it to a norm of international law. 630 F.2d at 881. *See also* 630 F.2d at 887–89. The court concluded that the cause of action "is properly brought in federal court." 630 F.2d at 887.

In *Tel-Oren,* Judge Edwards adopted the approach of the Second Circuit. He stated that § 1350 provides jurisdiction in federal district court where a plaintiff alleges a tortious violation of a principle of international law on which the community of nations has reached a consensus. This is true even where no other basis of jurisdiction is present, and regardless of whether or not a "right to sue" on that violation is independently granted by international law. 726 F.2d at 772–82. Applying these standards to the facts in *Tel-Oren,* Judge Edwards found that, however reprehensible the actions of the defendants may have been, no consensus existed among nations sufficient to warrant an extension of the *Filartiga* approach to the law of nations to include disapproval of non-state acts of violence or terrorism. 726 F.2d at 791–96.

The facts presented here easily satisfy the criteria set forth by Judge Edwards. An accredited diplomat has been detained and held incommunicado for more than 35 years; his whereabouts have been concealed; and the defendant may have caused his death. There can be no clearer violation of the law of nations. Under the analysis of Judge Edwards, this proceeding is appropriately before this Court.

### B.

Judge Bork concurred in dismissing *Tel-Oren* on the ground that plaintiffs had failed to meet a more stringent test than proposed by Judge Edwards and relied upon by the Second Circuit. Under Judge Bork's analysis, plaintiffs would have to show not only a violation of the law of nations, but also a source of a right to sue under federal or international law. 726 F.2d at 801, 808. Judge Bork stated that only by limiting § 1350 to cases in which

---

**15.** This position was endorsed by the United States Government in an amicus brief submitted by the Departments of State and Justice (Amicus Br. at 4–5).

the law of nations clearly envisions judicial involvement would the doctrine of separation of powers be properly served. In cases such as *Tel-Oren,* where the rule of decision under international law is insufficiently developed, he creates a presumption against jurisdiction which can only be overcome by showing that plaintiffs have been provided with a cause of action under federal or international law. 726 F.2d at 1808.

The facts and allegations of the present case appear to satisfy the requirements set forth by Judge Bork. First, in discussing the unsettled nature of international legal standards regarding terrorism, Judge Bork acknowledges that related areas have been the subject of international consensus through written conventions. 726 F.2d at 806–07. Among the conventions he lists is the 1973 Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents. Diplomatic immunity is an area in which international legal standards have long been clearly stated, and the Convention complements preexisting international accords on the treatment of diplomats.

■ In the course of his analysis, Judge Bork notes that he is "guided" by the language of the Supreme Court in *Banco Nacional de Cuba supra,* p. 254, in which the Court established a sort of sliding scale with respect to judicial application of international law:

[T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice.

726 F.2d at 804. The rules of diplomatic immunity are so well established that judicial determination of a violation of diplomatic immunity poses little or no threat to the doctrine of separation of powers. It is, therefore, fully consistent with the rationale underlying Judge Bork's opinion to permit the federal courts to apply the law of diplomatic immunity.

However, even if his opinion is read to require an explicit showing of a cause of action granted under international law in any case that may touch on foreign relations, plaintiffs' allegations fall within one of the areas that the opinion specifically places within the reach of § 1350.

He stated that the statute is given its more appropriately limited meaning by looking to the "law of nations" as understood in 1789. At that time, the "law of nations" was limited to three primary offenses: " '1. Violation of safe-conducts; 2. Infringement of the rights of embassadors; and 3. Piracy,' " 726 F.2d at 813, *quoting* 4 W. Blackstone, *Commentaries,* 68, 72, and Judge Bork concluded that "[o]ne might suppose that these were the kinds of offenses for which Congress wished to provide tort jurisdiction for suits by aliens in order to avoid conflicts with other nations." 726 F.2d 813–14. The American colonies, having adopted the common law of England, adopted a "private cause of action for which section 1350 gave the necessary jurisdiction to federal courts" in these three types of cases. 726 F.2d at 1814 n. 22. *See also Respublica v. De Longchamps,* 1 U.S. (1 Dall.) 111, 116, 1 L.Ed. 59 (Pa.Ct. Oyer & Term.1784). Thus, the doctrine of diplomatic immunity is so firmly established as to fall within even the very limited interpretation of § 1350 favored by Judge Bork.

### C.

■ Judge Robb invoked the political question doctrine to dismiss *Tel-Oren,* based on arguments similar to those used by Judge Bork in defense of the separation of powers. The opinion cautions against judicial interference in a politically sensitive area where the rule of decision is not adequately defined. 726 F.2d at 827 and *passim.* However, international legal standards with regard to the treatment of diplomats have long been clearly established, and their application should therefore pose

little risk of embarrassing the political branches. As Justice White wrote in his dissent in *Banco Nacional de Cuba*, while

> political matters in the realm of foreign affairs are within the exclusive domain of the Executive Branch ... this is far from saying that the constitution vests in the executive exclusive absolute control of foreign affairs or that the validity of a foreign act of state is necessarily a political question. International law, as well as a treaty or executive agreement, see *United States v. Pink*, 315 U.S. 203 [62 S.Ct. 552, 86 L.Ed. 796], provides an ascertainable standard for adjudicating the validity of some foreign acts, and courts are competent to apply this body of law, notwithstanding that there may be some cases where comity dictates giving effect to the foreign act because it is not clearly condemned under generally accepted principles of international law.

376 U.S. 461–62, 84 S.Ct. 957–58. The political question doctrine should therefore not defeat jurisdiction in this case.

### D.

Under any one of the three *Tel-Oren* opinions, § 1350 provides this Court with subject matter jurisdiction to consider this case. Plaintiffs are aliens; the causes of action they bring are in tort. There has, without question, been a violation of the law of nations, as defined by legal scholars, confirmed in international conventions to which the United States is a party, and codified in United States law. The requisites of the Edwards/*Filartiga* approach are thus satisfied.

The violations alleged involve an area of international law in which standards and norms have long been well-defined. The underlying rationale of the opinions of Judges Bork and Robb—a reluctance, where legal standards are uncertain, to permit the courts to enter politically sensitive areas—is therefore met.

Finally, this case satisfies the most stringent of the requirements set forth by Judge Bork. Well before 1789, the protection and well-being of diplomats were understood to be a part of the law of nations, and English (and then American) common law recognized a private cause of action where the law was violated. This right to sue has recently been reaffirmed by the Congress and this Court with respect to acts of violence against internationally protected persons.

### STATUTE OF LIMITATIONS

■ Plaintiffs' claims against the USSR are not barred by any applicable statute of limitations.[16] Plaintiffs contend that Raoul Wallenberg is still alive, and that his unlawful detention is therefore a continuing violation of the laws of the United States, the laws and treaties of the USSR, and the law of nations. In such circumstances, the

---

**16.** The appropriate District of Columbia statutes are applicable to all of plaintiffs' claims, including not only those arising under federal law but also those arising under other sources of law. With respect to plaintiffs' federal law claims, where, as in the present case, Congress has not enacted a statute of limitations governing a particular claim, the courts will look to the statute of limitations of the forum where the district court sits. *E.g., Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975); *Forrestal Village, Inc. v. Graham,* 551 F.2d 411, 413 (D.C.Cir. 1977). The forum statute of limitations to be applied is that which is applicable to the most closely analogous claim under the forum law, and that which best effectuates the federal policy involved. *E.g., McClam v. Barry,* 697 F.2d 366, 373–75 (D.C.Cir.1983); *Forrestal Village, Inc. v. Graham,* at 413.

With respect to plaintiffs' claims not arising under federal law, the statutes of limitations of the District of Columbia apply as the law of the forum. *E.g., Gilson v. Republic of Ireland,* 682 F.2d 1022, 1024–25 & n. 7 (D.C.Cir.1982); *Steorts v. American Airlines, Inc.,* 647 F.2d 194, 197 (D.C.Cir.1981).

The District of Columbia has several provisions which could arguably apply to one or more of plaintiffs' claims. The statute of limitations for "false arrest and false imprisonment," D.C.Code Ann. § 12–301(4) (1981), and for wrongful death, § 16–2702, are both one year. The D.C.Code also provides a three-year statute of limitations for claims which do not have "specially prescribed" limitations. § 12–301(8) (1981).

statute of limitations has not yet begun to run. The tortious conduct by the defendant is an ongoing violation which precludes the running of a limitations period.

In cases involving an ongoing tort, as here, the cause of action does not accrue for purposes of the running of the statute until the last act constituting the tort is complete. *See Page v. United States*, 729 F.2d 818, 821 (D.C.Cir.1984) (citing, *inter alia, Gross v. United States*, 676 F.2d 295, 300 (8th Cir.1982); *Leonhard v. United States*, 633 F.2d 599, 613 (2d Cir.1980), *cert. denied*, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981)).

■ Moreover, even if Raoul Wallenberg is no longer alive, defendant's concealment of the facts and circumstances surrounding Wallenberg's detention and possible death, since the 1957 Gromyko note, provides two further reasons for this Court to refrain from barring plaintiffs' claims. First, under the "discovery rule" of the District of Columbia, plaintiffs' claims have not yet accrued for statute of limitations purposes. Under this rule, a plaintiff's cause of action does not accrue until the plaintiff learns, or with reasonable diligence could have learned, that he has been injured, *see, e.g., Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 116–18 (D.C.Cir.1982); *Grigsby v. Sterling Drug, Inc.*, 428 F.Supp. 242, 243 (D.D.C.1975), *aff'd without opinion*, 543 F.2d 417 (D.C.Cir.1976), *cert. denied*, 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977), and that his injury is due to wrongdoing on the part of the defendant, *see, e.g., Dawson v. Eli Lilly and Co.*, 543 F.Supp. 1330, 1333–34 (D.D.C.1982).[17]

In this proceeding, the plaintiffs have no way of knowing whether Wallenberg is dead, or, if he is dead, the circumstances of his death and the identity of those responsible. The Gromyko note, in light of the weight of contradictory evidence, cannot provide a reasonable basis for holding that plaintiffs have learned that Wallenberg is no longer alive. Such information remains solely within the control of the USSR.

Second, when a defendant has fraudulently concealed facts giving rise to a cause of action, the statute of limitations is tolled until plaintiffs, employing due diligence, discover or should have discovered the facts giving rise to the claim—in this case, evidence that Wallenberg is indeed no longer alive and that defendant was involved in his death. *Richards v. Mileski*, 662 F.2d 65, 68–69 (D.C.Cir.1981). *See also, e.g., Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir. 1984), *cert. denied sub nom Brennan v. Hobson*, —— U.S. ——, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). With respect to the matter of burden of proof and due diligence, our Circuit Court stated in *Richards*:

> When tolling is proper because the defendants have concealed the very cause of action, or their involvement in a cause of action about which the plaintiff might otherwise be aware, they have the burden of coming forward with any facts showing that the plaintiff could have discovered their involvement or the cause of action if he had exercised due diligence.

662 F.2d at 71. *See also Smith v. Nixon*, 606 F.2d 1183, 1191 (D.C.Cir.1979), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997, 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1024 (1981). The defendant cannot meet this burden. Since 1945, it has concealed the truth concerning the condition and whereabouts of Raoul Wallenberg.

## THE MERITS

### A.

■ There are few principles of international law, if any, that are as universally

---

**17.** Application of the discovery rule in the District of Columbia is not limited to any specific type of tortious injury. Rather, the rule is applicable to any "tort clai[m] in which the fact of injury may not be readily discernible." *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d at 116. *See Burns v. Bell*, 409 A.2d 614, 615 (D.C.App. 1979). The Fifth Circuit in *Dubose v. Kansas City Southern Ry.*, 729 F.2d 1026 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 179, 83 L.Ed. 179 (1984), recently held that the discovery rule applies to all federal causes of action "whenever a plaintiff is not aware of and had no reasonable opportunity to discover the critical facts of his injury and its cause." 729 F.2d at 1030.

recognized as the principle of diplomatic immunity. The seizure and detention of Raoul Wallenberg presents a clear violation of the law of nations as well as a clear violation of the laws and treaties of the United States and the Soviet Union. Moreover, the record in this action is clear, in that it does not show that the Soviet Union has sought, in any manner, to justify its conduct toward Wallenberg. Indeed, the 1957 Gromyko Note, *supra* pp. 5–6, characterizes his detention and the concealment of his whereabouts as criminal activity.

The history of the diplomatic immunity doctrine is traced from many recognized sources. *See* D. Michaels, *International Privileges and Immunities*, 7, 1971; 1 L. Oppenheim, International Law § 386 (1905); Restatement of Foreign Relations Law of the United States (Revised) § 461 (Tent. Draft No. 4, 1983). The concept was a part of the ancient civilizations of China, India and Egypt, *United States v. Enger*, 472 F.Supp. 490, 504 (D.N.J.1978).

The present day consensus of the international community on the protection afforded diplomats has been codified in a number of international agreements, primarily the Vienna Convention on Diplomatic Relations, April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502. Article 29 of the Convention states that

> [t]he person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.

23 U.S.T. at 3240, T.I.A.S. No. 7502 at 14. Corresponding obligations are imposed upon states other than the receiving state under Article 40 of the Convention. 23 U.S.T. at 3246, T.I.A.S. No. 7502 at 20–21.

In the 1970s, the community of nations reaffirmed its commitment to the safety of diplomats by entering into the Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, December 14, 1973, 28 U.S.T. 1975, T.I.A.S. No. 8532. The Convention requires signatory nations to take steps to punish the "murder, kidnapping or other attack upon the person or liberty of an internationally protected person," 28 U.S.T. at 1978, T.I.A.S. No. 8532 at 4, as well as other crimes or threats against them. The Soviet Union is a party to both the Vienna Convention and the 1973 Convention.

Wallenberg's treatment at the hands of the Soviet Union also violates a number of international treaties and conventions relating to human rights, all of which have been signed by the Soviet Union. Under Articles 55 and 56 of the United Nations Charter, each member state pledges to take action to promote "universal respect for, and observance of, human rights and fundamental freedoms." 59 Stat. 1033, 1045–46 (1945). These obligations are given further substance in subsequent documents. Article 3 of the Universal Declaration of Human Rights, G.A.Res. 217A (III), U.N. Doc. A/1810 (1948), mandates the protection of "life, liberty and security of person." Article 9 protects the right not to "be subjected to arbitrary arrest, detention or exile." Article 10 protects each person's right to a fair and public hearing of criminal charges against him. Article 12 protects the right not to "be subjected to arbitrary interference with ... privacy, family, home or correspondence." The international community—including the Soviet Union—reaffirmed its commitment to these rights in the International Covenant on Civil and Political Rights, G.A.Res. 2200 (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1967),[18] and again in the Final Act of the Conference on Security and Cooperation in Europe (Helsinki 1975), Department of State Bulletin Reprint, Sept. 1, 1975.

### B.

United States law has long accepted international standards of diplomatic immunity as part of its common law and has

---

**18.** The United States has signed but not yet ratified this Convention.

recognized a private civil cause of action for a violation of diplomatic immunity. *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 814 n. 22 (D.C.Cir.1984). In *Respublica v. De Longchamps*, 1 U.S. (1 Dall.) 111, 1 L.Ed. 59 (Pa.Ct.Oyer & Term.1784), the Supreme Court held that the De Longchamps committed "an atrocious violation of the law of nations," when, having first insulted the Consul General of France to the United States, he struck the cane of the diplomat. The Court described De Longchamps' actions as gross insults, and diplomats as "the peculiar objects" of the law of nations. 1 U.S. (1 Dall.) at 111, 117.

In 1976, the United States Congress enacted the Act for the Prevention and Punishment of Crimes Against Internationally Protected Persons, 18 U.S.C. §§ 1116, 1201, 112, 970, 878 and 11. That criminal statute proscribes the murder or attempted murder of an internationally protected person, and permits the exercise by the United States of jurisdiction over such an offense "if the alleged offender is present within the United States, irrespective of the place where the offense was committed or the nationality of the victim or the alleged offender." 18 U.S.C. § 1116(c). An "internationally protected person" is defined as including, *inter alia*,

> any ... representative, officer, employee, or agent of the United States Government, a foreign government, or international organization who at the time and place concerned is entitled pursuant to international law to special protection against attack upon his person, freedom, or dignity.

18 U.S.C. § 1116(b)(4)(B). Similar prohibitory and jurisdictional language governs the kidnapping of such a person under 18 U.S.C. § 1201(a)(4) and (e).

 At the time of his kidnapping, Raoul Wallenberg was an accredited Swedish diplomat. He was thus an "internationally protected person" within the meaning of §§ 1116 and 1201(a)(4) and (e). His kidnapping was therefore a violation of § 1201(a)(4); if he is no longer alive, § 1116 has also been violated. In enacting these statutes, Congress expressly declared its intent to prohibit such acts wherever and by whomever committed, and whatever the nationality of the victim.

Moreover, this Court has recognized a civil cause of action under federal law on behalf of private plaintiffs pursuant to 18 U.S.C. § 1116. In *Letelier*, 502 F.Supp. at 266, jurisdiction was upheld in a suit brought by the surviving spouses of an exiled Chilean diplomat and his co-worker against those responsible for their murder. The same rationale should apply to § 1201(a)(4) and (e). Under both, plaintiffs are entitled to immediate declaratory relief.

### C.

The Soviet Union's treatment of Raoul Wallenberg is unlawful even under its own statutes.[19] The Statute on Diplomatic and Consular Representations of Foreign States on the Territory of the USSR, confirmed by edict of the Presidium of the USSR Supreme Soviet on May 23, 1966, set forth in *Collected Legislation of the Union of Soviet Socialist Republics and the Constituent Union Republics* (Butler ed. 1983), affirms the privileges and immunities due to diplomats, Article 1, as well as the primacy of "international treaty rules" on the subject, Article 3. By its terms, the statute applies to diplomatic or consular representations "on the territory of the USSR." Article 1. The "inviolability" while travelling in the "territory of the USSR" of diplomats representing a "foreign state in a third country" is specifically assured in Article 18. The detention of Wallenberg plainly violates the diplomatic immunity guaranteed by the statute.

Wallenberg's detention is also violative of the Criminal Code of the Russian Soviet Federated Socialist Republic, and corresponding provisions of the Criminal Codes of other Republics of the USSR. Article

---

**19.** In addition to the laws cited in this section, the Soviet Union is party to treaties the terms of which have been violated by the acts against Wallenberg. *See* discussion at pp. 361–62, *supra*.

126 of the Federated Socialistic Republic Criminal Code outlaws any deprivation of freedom that was illegal as of the time committed. Article 178 proscribes an arrest or detention which is known to be illegal and which is illegal in fact. Wallenberg's arrest and detention were and continue to be illegal under principles of international law and international agreements which were in force in 1945 and to which the USSR was a party. Moreover, the 1957 Gromyko Note acknowledged the illegality of Wallenberg's detention and of the misinformation that made it possible.

The Soviet Union's treatment of Raoul Wallenberg is unlawful under any standard of applicable law. It has never argued otherwise; it has denied and disclaimed its actions, but it has never defended them.

### CONCLUSION

In many ways, this action is without precedent in the history of actions against foreign sovereigns. It involves actions which the Soviet Union has already admitted were unlawful. It involves a gross violation of the personal immunity of a diplomat, one of the oldest and most universally recognized principles of international law. Furthermore, this action involves a deliberate default by a defendant which has repeatedly demonstrated its familiarity with the proper means for raising a defense of sovereign immunity under the Foreign Sovereign Immunities Act.

There can be little, if any, doubt that both subject matter and personal jurisdiction are conferred through that Act. Whatever sovereign immunity the defendant might have had, is, by the terms of the Act, subject to international agreements to which the United States was a party when the FSIA was enacted in 1976 which prohibit defendant's actions regarding Mr. Wallenberg.

Additionally, this Court determines that no applicable statute of limitations has begun to run against plaintiff's claims. Because Mr. Wallenberg is still being unlawfully held by the defendants, or alternatively, he is dead, the statute is tolled by the "discovery rule" and/or the law on tolling applicable when one party has fraudulently concealed facts.

For all of these reasons, default judgment is hereby entered against the defendant.